[No. 32970-7-I.   Division One.   May 1, 1995.]

SHIRLEY NOAKES, ET AL, *Appellants*, v. THE CITY OF SEATTLE, ET AL, *Respondents*.

*Mark Leemon,* for appellants.

*Mark H. Sidran, City Attorney,* and *Marcia M. Nelson, Assistant,* for respondents.

GROSSE, J. — Shirley Noakes and her daughter Marie Noakes appeal the granting of a motion for summary judgment to the City of Seattle dismissing their complaint for damages against the City.

## FACTS

Shortly before 1 a.m. on March 18, 1990, Shirley and Marie, both developmentally disabled, were beaten and raped in their home by William Jimerson. Before, and as, Jimerson

broke into the home, Shirley or Marie called 911 on three separate occasions within a 9- to 11-minute period.[1] Each time one of them called, a 911 operator told Shirley or Marie that police would be sent out, or would be sent as soon as possible. In the first call, after being questioned as to whether she was drunk,[2] an obviously upset Shirley was told by the 911 operator, "We're broadcasting this information" and, almost immediately thereafter, "We'll send someone out". During the second call a 911 operator told Shirley that it had her call as a "waiting call" and stated, "We'll get somebody down there just as soon as we can get a unit available. We've got about fifteen waiting calls. . . . We'll get somebody by just as soon as we can." A few minutes later Marie called 911 and stated she didn't care who 911 sent, "somebody, anybody, even a medic". She indicated the prowler was breaking the bedroom window and was about to enter the house. Later in the conversation Marie indicated the prowler was *in* the house. The 911 operator (a different one from the others) again asked if the caller (Marie) had been drinking. She explained that she had not been drinking, but she was scared.

Approximately 30 minutes after the last of these three calls, a 911 dispatcher called the Noakes' residence to see if they were still in need of help. Because Jimerson was present, threatening them, had already raped at least one of them, and was acting "out of his mind", Shirley reported the prowler had gone and the call could be canceled. There is no transcript of this call in the record. Approximately 1 to $1^1/2$ hours later, Marie was able to run to a neighbor's house and called 911 again. When the police did not arrive, the neighbor called 911 and told the dispatcher there was a man in the Noakes' house, Marie was injured, and Shirley was still in the house with the intruder. Shortly thereafter, police arrived. Jimerson was found and arrested.

---

[1] The 911 tapes of these calls were never entered into evidence. However, a transcript of the three initial calls to 911 and later calls by Marie and a neighbor are in the record before this court.

[2] Shirley has a speech impediment which led the 911 operators to mistakenly suspect that she was intoxicated.

Jimerson was charged and convicted of rape and assault of the two women. Shirley and Marie sued the City for damages due to its negligence and failure to respond to their 911 calls. The City brought on a motion for summary judgment requesting dismissal. The City claimed in one of its defenses that it was protected from liability by the public duty doctrine, and that the Noakes did not fit into any exception to this doctrine.

In response, the Noakes presented the affidavit of a police expert, retired Bellevue Chief of Police D.P. Van Blaricom, and their own affidavits. Van Blaricom opined that the police should and could have done more to get assistance to the Noakes, that it improperly classified the call as being of lesser importance, and that the police had given specific assurances of assistance to them. The affidavits of Shirley and Marie opined that the facts supported their claim that the 911 operator gave express assurances to them of police assistance and that they relied on this assistance in order to prevent them from being harmed or taking other possible action.

### DISCUSSION OF THE CASE

■ The Noakes argue that the trial court erred in entering summary judgment in favor of the City because the 911 operator gave them specific assurances of help, creating a special relationship between them and police. We apply the usual standard of review on summary judgment. However, it is important to restate that on review this court considers all facts and reasonable inferences in the light most favorable to the Noakes. *Simpson Tacoma Kraft Co. v. Department of Ecology*, 119 Wn.2d 640, 646, 835 P.2d 1030 (1992). We must decide whether the trial court correctly determined that the Noakes failed to establish a legally cognizable cause of action or that there is no question of material fact in regard to the determination of the existence of a cause of action.

■■ The threshold determination in a negligence action is whether a duty of care is owed by the defendant to the plaintiffs. Whether the defendant is a governmental entity or a private person, the duty must be one owed to the in-

jured, plaintiff and not to the public in general. *J&B Dev. Co. v. King Cy.*, 100 Wn.2d 299, 304, 669 P.2d 468, 41 A.L.R.4th 86 (1983), *overruled on other grounds by Taylor v. Stevens Cy.*, 111 Wn.2d 159, 759 P.2d 447 (1988). This basic principle of negligence law is expressed as the public duty doctrine. Under this doctrine, no liability may be imposed for a public official's negligent conduct unless it is shown that "the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (*i.e.*, a duty to all is a duty to no one)." *J&B Dev. Co.*, 100 Wn.2d at 303; *Chambers-Castanes v. King Cy.*, 100 Wn.2d 275, 284, 669 P.2d 451, 39 A.L.R.4th 671 (1983); 18 Eugene McQuillin, *Municipal Corporations* § 53.04b (3d ed. 1984).

■ Most public duty doctrine cases concern permits, construction issues, or other cases dealing with nonpolice services. *Chambers-Castanes v. King Cy.*, 100 Wn.2d at 286, first stated the test for determining whether an actionable duty to provide police services arises under the facts and circumstances of a given case. The court stated:

> [A]n actionable duty to provide police services will arise if, (1) there is some form of privity between the police department and the victim that sets the victim apart from the general public, and (2) there are explicit assurances of protection that give rise to reliance on the part of the victim.

(Footnote and citations omitted.)

This test was revised later in *Taylor v. Stevens Cy.*, 111 Wn.2d 159, 168, 759 P.2d 447 (1988) and in *Meaney v. Dodd*, 111 Wn.2d 174, 180, 759 P.2d 455 (1988). In those cases the State Supreme Court overruled *J&B Dev. Co.*, holding that a governmental duty cannot arise from *implied* assurances.

For the purposes of summary judgment, the City neither contested the existence of privity between the Noakes and itself, considering the fact that Shirley and Marie called 911 personally seeking assistance, nor asserted that the Noakes were not injured. However, the City claims there were no express assurances of police services given to the Noakes, and no evidence that Shirley and Marie relied to their detriment on any assurances.

In response to the motion for summary judgment, the Noakes filed four affidavits: one from each of them, one from a police "expert", and one from their attorney. In his affidavit, police expert D.P. Van Blaricom opined that "the Seattle Police Department undertook a special duty to plaintiffs".

We find that the opinion from a police expert together with the Noakes' affidavits presents, at a minimum, a question of fact as to whether the various statements made by the 911 operators were "express assurances" under the *Chambers-Castanes* test, or merely implied assurances as in *Taylor*. This is especially true when considering the first call. The statement "we'll send someone out" could be construed by a reasonable trier of fact as an express and explicit assurance that the police would be right out. In the second call, there was an explanation given as to why a police unit had not yet been dispatched, but Shirley Noakes was told, nonetheless, that someone would be sent "as soon as we can get a unit available" and "as soon as we can".

This case is very similar to the facts of *DeLong v. Erie*, 60 N.Y.2d 296, 457 N.E.2d 717, 469 N.Y.S.2d 611 (1983), cited by the Noakes. There, a victim called police, giving her address and indicating a burglar was breaking into her house. The operator responded "okay, right away". However, the operator took down the address incorrectly and police could not find the victim, who was eventually stabbed to death. The court held that the response of the operator was sufficient to allow a jury to find express assurances of help. The same is true here.

Proof of justifiable reliance may be difficult. However, in response to the City's motion for summary judgment, the Plaintiffs' expert opined that Shirley and Marie could rely on the police assurances and stay in their home, rather than necessarily search for another way of protection or escape. The City cites *Rome v. Jordan*, 263 Ga. 26, 426 S.E.2d 861 (1993), to show by analogy that the Noakes placed no reliance on the phone calls to 911. The *Rome* case is easily distinguished in that the *Rome* court found there could be no reliance because the person who thought the police had been

dispatched did not relay that information to the victim who was then injured.

Here, both Shirley and Marie clearly indicated their expectation and reliance on the police to provide protection. Although possibly considered "conclusory", it is hard to determine how else they could express any reliance on the police coming for their protection other than the fact that they stayed in their home. One of the police reports contained a statement that the women were going to try to "make a run" for their neighbor's house after Jimerson finally broke in. However, Jimerson caught them and began beating them before they could escape. If it weren't for the assurances of the police, the women might have attempted other methods of escape or self-assistance.

The exceptions to the public duty doctrine are meant to allow actions in those instances where a special relationship or duty exists or arises between a government entity and an individual or individuals. In the case before us the question as to whether the 911 operator made express assurances to Shirley and Marie Noakes so as to give rise to a special relationship is one for the jury. The same is true with regard to the issue of whether the assurances were such that the Noakes could reasonably have relied on them. This is a classic circumstance where the duty arises from the facts presented and thus, all but infrequently, involves questions of material fact. To phrase this more classically: Do these facts give rise to what a reasonable person under similar circumstances would take as explicit assurances and then reasonably rely upon those assurances in taking or refraining from taking action?

The decision of the trial court is reversed and the case remanded for trial.

PEKELIS and SCHOLFIELD, JJ. Pro Tem., concur.

Review denied at 127 Wn.2d 1021 (1995).