[No. 18864-3-II.   Division Two.   October 21, 1996.]

RUSSELL R. WEBSTAD, *as Personal Administrator, Appellant*, v. JOSEPH STORTINI, *Respondent*.

*Paul A. Lindenmuth, Ralph Seeley,* and *Law Offices of Neil J. Hoff,* for appellant.

*Sidney R. Snyder, Jr., Asa D. Glazer,* and *Merrick, Hofstedt & Lindsey,* for respondent.

HOUGHTON, A.C.J. — Susan Webstad committed suicide at Joseph Stortini's residence. Her son, Russell Webstad, as personal administrator of Susan Webstad's estate (Web-

stad), alleged that Stortini's negligent conduct on the night of the suicide caused Susan Webstad's death. The trial court granted summary judgment in favor of Stortini, dismissing Webstad's wrongful death and survival actions. Webstad appeals, arguing that issues of fact exist as to Stortini's liability. We find no statutory or common law duty and no "special relationship" giving rise to a duty in this case. We also decline to extend the scope of duty to require that any individual prevent another individual from committing suicide absent a "special relationship." We therefore affirm.

## FACTS[1]

Susan Webstad worked in the Pierce County Executive's office with Stortini, then Pierce County Executive, until mid-1988. At that time, Susan Webstad transferred from the Pierce County Executive's office to the Pierce County Solid Waste Division, where she no longer worked with Stortini. After this transfer, she and Stortini became romantically involved. In October 1989, Stortini revealed the relationship to his wife, and the Stortinis separated. Susan Webstad also told her husband, and the Webstads eventually dissolved their marriage.

The relationship continued for two years, but it eventually deteriorated. During that time, Susan Webstad frequently sought a definite commitment from Stortini.[2] Stortini remained in regular contact with her. Susan Webstad's daughter, Ericka Webstad, thought Stortini manipulated her mother by periodically returning to his wife and by not keeping commitments to her.

Susan Webstad had been treated for alcoholism and had

---

[1]The nature of these claims necessitates a lengthy recitation of facts.

[2]Webstad argues that Susan Webstad asked Stortini to commit to the relationship or end the relationship. In support of this argument, he cites to the Clerk's Papers at 225-26; however, those pages do not relate to this issue. In a letter that Susan Webstad wrote to Stortini, she asked him to commit to their relationship or she would end it. It is unclear whether Stortini received this letter.

made suicidal gestures in the past. Stortini thought that Susan Webstad was an alcoholic and was aware that she had entered an alcoholic rehabilitation center for treatment. According to Stortini, Susan Webstad continued to drink after the treatment. Stortini occasionally drank with her.

Susan Webstad took various prescription medications for high blood pressure. In September 1989, Susan Webstad telephoned Stortini, intoxicated, unhappy, saying that she was going to take some pills. Stortini went to her apartment, and he found her intoxicated and passed out. He shook her awake, and she recovered without medical assistance. Stortini conceded in his deposition that it was possible that she made this suicidal gesture because she was upset about their relationship.

In November 1989, Susan Webstad took a nonlethal dose of her blood pressure medicine and alcohol "in the context of an acute relationship crisis." The doctor found her suicide risk insufficient to necessitate further hospitalization but recommended outpatient treatment. Later her doctor prescribed antidepressant medication.

A few days after this incident, Susan Webstad drank alcohol with the antidepressants, she became despondent, and members of her family took her to the hospital. According to the attending physician's report, Susan Webstad told him that she had been "jilted" by the married man with whom she was having an extramarital relationship and that this led to her distress. Another physician examined her and noted that Susan Webstad was having problems with her boyfriend, and was feeling abandoned, lonely, and sad. Her physician summarized her condition as: "[a]lcohol abuse [with] several recent suicide gestures without lethal potential." Ericka Webstad told Stortini about this incident.

Stortini's secretary, a friend of Susan Webstad's, told Stortini that Susan Webstad called her when she was intoxicated to talk about suicide and about her unhappiness with his lack of commitment. When she was intoxi-

cated, Susan Webstad would tell Stortini that his on-again, off-again approach to their relationship and his failure to make a commitment greatly upset her. According to Stortini, she "made comments [about suicide to Stortini] quite often," such as "I just don't want to live." And she told him "that she had a way of taking her life." Stortini assumed this was a reference to taking pills. The issues of suicide or pill taking and their relationship came up only when Susan Webstad was drinking.

On August 25, 1991, Stortini and Susan Webstad spent the evening together at his home. When Susan Webstad arrived, Stortini thought that she appeared to have been drinking, although she did not have an excessively intoxicated manner. Stortini said that Susan Webstad drank only a few sips of his beer.[3]

The two picked berries, ate the dinner that Susan Webstad brought, and then watched the movie that Stortini had rented, which was about divorced people who remarried happily. Following the movie, they talked about its theme. The conversation turned to their relationship and to Susan Webstad's continued desire that Stortini commit to their relationship. Stortini, however, told Susan Webstad that he was unwilling to divorce his wife in order to make a commitment and wanted to restore his marriage if possible. According to Stortini, Susan Webstad responded "obvious[ly] . . . you don't want me . . . . [I] know[ ] how to take care of that."[4]

Susan Webstad then got up, retrieved her purse, and

---

[3]According to Webstad, Stortini told him that they also drank wine. Stortini correctly points out that this statement is not in the record on appeal because this page of Webstad's deposition was not attached to any of the documents he submitted to the trial court. Generally, an appellate court does not consider materials not submitted to the trial court. See CR 56(e) (all papers "shall be attached"); RAP 9.12 (appellate court will consider only evidence called to the attention of the trial court); Melville v. State, 115 Wn.2d 34, 36, 793 P.2d 952 (1990) (court does not consider facts unsupported by documents). Nevertheless, viewing the rest of the evidence in the light most favorable to the nonmoving party gives rise to the inference that Susan Webstad had been drinking alcohol. Furthermore, blood tests revealed that she had alcohol in her system.

[4]Stortini characterized the conversation as "calm" in his deposition. Two days after Susan Webstad's death, Stortini told the police that he thought she

went into the kitchen. Stortini followed her into the kitchen, where he saw a pill container on the sink and a couple of pills dissolving in the sink. Stortini asked her how many pills she had swallowed. She replied 8 or 10. He thought they were her blood pressure pills. He told the police that he remembered her daughter's telling him that Susan Webstad had previously gone to the hospital and had her stomach pumped after taking blood pressure pills, but that she was fine in a couple of days. According to Stortini, he asked Susan Webstad to go with him to the hospital or to let him call 911 dispatch, but she said no. She said that she had "taken pills before," that she was "going to be okay," and that she was "fine."

Over the next half to one hour, Stortini thought that Susan Webstad appeared to be fine. She and Stortini sat down and talked. Susan Webstad then went to the bathroom, and Stortini followed her and found her kneeling over the toilet trying to "spit up." She again declined his suggestions to go to the hospital or to call 911 dispatch, and asked for a glass of milk to help her vomit. She then said she needed fresh air, and they moved to the open patio door where Stortini placed a cool towel on her forehead. Susan Webstad then suggested that Stortini call the Group Health pharmacy for advice. Stortini went to the kitchen to find the telephone number but could not locate it. He returned to the place where Susan Webstad had been sitting and saw her lying on the floor unconscious. Stortini then slapped her face to try to revive her. When Susan Webstad did not respond, Stortini immediately called 911 dispatch.

When Stortini called 911 dispatch at about 1:45 a.m., he

was upset, but he appeared not to think that she was crying or making threats. On the morning of her death, one police officer reported that Stortini said that:

"[Susan Webstad] threatened to take some pills and had made references that she knew how to commit suicide if she wanted[ ] because she had the pills to do it with. [Stortini] said they continued talking[,] and he attempted to dissuade her from her depressed state of mind. He said she took a handful of pills out of her purse and as he was talking to her[,] she took a drink of water . . . and apparently swallowed some of them. When he asked her what she had done she said [that] these are very mild pills and that it was not a problem."

asked that aid units respond without lights and sirens. As an elected official, he was concerned about publicity. He told the police that he did not want "a big scene." The aid units responded within 5 to 10 minutes, with lights and sirens, and took Susan Webstad to the hospital. She died at about 9 a.m. on August 26.

Stortini issued a press release responding to the event. Both Pierce County and King County police officers interviewed Stortini.

The Pierce County Medical Examiner ruled that Susan Webstad's death was a suicide by Verapamil overdose. Verapamil was one of the medications Susan Webstad was taking for high blood pressure. The King County Medical Examiner also reviewed the case and believed that this was a " 'suicidal gesture that went wrong' " and that Susan Webstad had " 'no true appreciation of the ultimate consequence.' "

Webstad brought this action against Stortini, claiming that his negligent conduct on the night of the suicide caused Susan Webstad's death. Webstad alleged that Stortini was negligent both in telling Susan Webstad he would not commit to her, knowing of her suicidal tendencies, and in handling the situation after she ingested the pills.

The trial court granted summary judgment dismissing Webstad's claims. The trial court concluded that, under the facts of this case, Stortini did not owe a duty to Susan Webstad in connection with her suicide, nor did his conduct or omissions proximately cause her death. Webstad appeals.

## ANALYSIS

■ We review a trial court's grant of summary judgment de novo and engage in the same inquiry as the trial court. *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 437-38, 874 P.2d 861 (citing *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982)), *review denied*, 125 Wn.2d 1006 (1994). "Summary judgment is properly granted when the pleadings, affidavits, depositions and admissions on file

demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Lauritzen*, 74 Wn. App. at 437 (citing CR 56(c); *Kesinger v. Logan*, 113 Wn.2d 320, 325, 779 P.2d 263 (1989)). We consider all facts and reasonable inferences in the light most favorable to the nonmoving party, and uphold the grant of summary judgment only if, given all of the evidence, reasonable persons could reach but one conclusion. *Lauritzen*, 74 Wn. App. at 437 (citing *Scott v. Pacific W. Mountain Resort*, 119 Wn.2d 484, 502-03, 834 P.2d 6 (1992); *Kesinger*, 113 Wn.2d at 325).

■ ■ "In order to prove actionable negligence, a plaintiff must establish: (1) the existence of a duty owed to the complaining party; (2) a breach of that duty; (3) injury; and (4) that the claimed breach was a proximate cause of the resulting injury." *Lauritzen*, 74 Wn. App. at 438 (citing *Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992); *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984)). The threshold determination in any negligence case, however, is whether the defendant owed a duty of care to the plaintiff. *Lauritzen*, 74 Wn. App. at 438. "Whether a defendant owes a duty of care to a plaintiff is a question of law." *Lauritzen*, 74 Wn. App. at 438 (citing *Hansen*, 118 Wn.2d at 479; *Pedroza*, 101 Wn.2d at 228).[5] When no duty of care exists, a defendant cannot be subject to liability for negligent conduct. *Lauritzen*, 74 Wn. App. at 438.

■ ■ "Under the common law 'a private person does not have a duty to protect others from the criminal acts of third parties.'" *Lauritzen*, 74 Wn. App. at 438 (quoting *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 223, 802 P.2d 1360 (1991); citing E.L. Kellett, Annotation, *Comment Note — Private Person's Duty and Liability For Failure to Protect Another Against Criminal Attack by Third Person*, 10 A.L.R.3D 619 § 3 (1966) (collecting cases)).

[5]Whether a legal duty exists depends upon the relationship of the parties and the foreseeability of the risk involved. *Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789, 792 (Minn. 1995).

Furthermore, the law provides no general duty to protect others from self-inflicted harm, i.e, suicide. *See, e.g., Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789, 792 (Minn. 1995) (noting that courts are reluctant to impose liability on others for self-inflicted harm because the intentional and deliberate nature of suicide is similar to an unforeseeable intervening act (citation omitted)).

Suicide is " 'a voluntary willful choice determined by a moderately intelligent mental power[,] which knows the purpose and the physical effect of the suicidal act.' " *Hepner v. Department of Labor & Indus.*, 141 Wash. 55, 59, 250 P. 461 (1926) (quoting *In re Sponatski*, 220 Mass. 526, 108 N.E. 466 (1915), *superseded by statute as stated in Globe Sec. Sys. Co. v. Workman's Compensation Appeals Bd.*, 518 Pa. 544, 544 A.2d 953, 957 (1988) (adopting chain-of-causation test to examine liability for suicide; rejecting uncontrollable impulse test)). Thus, in cases of suicide, the person committing suicide is in effect both the victim and the actor. In fact, no duty exists to avoid acts or omissions that lead another person to commit suicide unless those acts or omissions directly or indirectly deprive that person of the command of his or her faculties or the control of his or her conduct. *Orcutt v. Spokane County*, 58 Wn.2d 846, 850-53, 364 P.2d 1102 (1961).

Washington has no statute imposing a duty to prevent another person from committing suicide. We note, however, that our Legislature has spoken on the issue of suicide in RCW 9A.36.060 (criminalizing the promotion of a suicide attempt) without imposing a general duty of prevention. The Legislature's silence on this issue indicates that it intended no general duty to prevent suicide.

Webstad notes that several countries and three states have adopted statutes that recognize the duty to aid someone in peril. Even if Susan Webstad's decision to commit suicide could be recognized as a protected peril, Washington has not adopted such a statute. We believe such a significant change to state law, if appropriate, should be made by the Legislature.

Washington does, however, recognize an exception to the general "no duty" to prevent suicide rule when " 'a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.' " *Lauritzen*, 74 Wn. App. at 438 (quoting *Hutchins*, 116 Wn.2d at 227 (quoting *Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983))).

Washington has adopted the description of the "special relationship" that triggers a duty from the RESTATEMENT (SECOND) OF TORTS § 315 (1965):

> There is no duty so to control the conduct of a third person as to prevent him [or her] from causing physical harm to another unless
>
> (a) a special relation[ship] exists between the actor and the third person[,] which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation[ship] exists between the actor and the other[,] which gives to the other a right to protection.

*Lauritzen*, 74 Wn. App. at 438 (quoting *Petersen*, 100 Wn.2d at 426 (quoting with approval RESTATEMENT (SECOND) OF TORTS § 315 (1965))).

Essentially, Webstad contends that the trial court erred in concluding that no "special relationship" existed between Stortini and Susan Webstad giving rise to a duty. He argues that a "special relationship" arose either (1) by expansion of the "special relationships" recognized in Washington or (2) by adoption of the California rule, discussed *infra*, that a "special relationship" arises when a defendant creates or increases the risk of harm to another person or creates a dependent relationship, inducing reliance or preventing others from assisting.

In particular, Webstad asserts that the totality of the facts of this case, including that Stortini and Susan Webstad were romantically involved, that Stortini was Susan Webstad's employer, and that Stortini had invited Susan Webstad to his home, created a "special relationship" giving rise to a duty for Stortini to render assistance to Susan

Webstad. He further asserts that Stortini's behavior caused or increased the risk of harm to Susan Webstad, also giving rise to a "special relationship" that established a duty:

> [Webstad] contends that it was [Stortini's] conduct on the night of the death that caused the risk from which the duty arose. [¶] On the night that Susan Webstad died, [Stortini] stated [that] she arrived at his home obviously intoxicated. He served her alcohol. He was aware that she became very upset about their relationship while under the influence of alcohol. He stated that the subject only came up when she was drinking. He knew she had attempted to commit suicide several times . . . prior to her death because of their relationship. He rented a video that depicted a subject matter that was sure to raise the topic of their relationship. [¶] Given the above facts, a jury could find that [Stortini] created or raised the risk of harm to [Susan] Webstad and, therefore, [Stortini]'s conduct created a special relationship in which a duty of care is imposed.

Webstad argues that under either theory of "special relationships," Stortini violated two duties. First, before Susan Webstad took the pills, Stortini, knowing of her fragile mental condition, either should have committed to or broken off the relationship and should not have engaged in activities on the night of the suicide that exacerbated Susan Webstad's fragile mental state. Second, in addition or in the alternative, Stortini should have obtained assistance immediately after Susan Webstad took the pills, regardless of whether she wanted any medical assistance.

When a "special relationship" exists, one person may have a duty to foresee that the risk of harm exists as to the other. *Lauritzen*, 74 Wn. App. at 438 (no special relationship between married driver and passenger); *Bartlett v. Hantover*, 9 Wn. App. 614, 621, 513 P.2d 844 (1973) (special relationship existed between employer and employee), *rev'd in part on other grounds*, 84 Wn.2d 426 (1974).

Washington courts have recognized a "special rela-

tionship" between a defendant and a foreseeable victim that gave rise to a legal duty to protect the victim from foreseeable criminal acts of third parties in circumstances that are " 'protective in nature, historically involving an affirmative duty to render aid.' " *Lauritzen*, 74 Wn. App. at 439 (quoting *Hutchins*, 116 Wn.2d at 228; citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 56, at 383 (5th ed. 1984)).[6] But in all cases imposing a duty based on a "special relationship," the courts have found that the relationship involved an element of "entrustment"; i.e., one party was, in some way, entrusted with the well-being of the other party. *Lauritzen*, 74 Wn. App. at 440.

A "special relationship" duty arises when the relationship has a direct supervisory component, but does not always require the presence of a custodial relationship. *See Taggart v. State*, 118 Wn.2d 195, 219, 223, 822 P.2d 243 (1992) (special supervisory relationship may arise when parole officers have taken charge of parolees they supervise, even though there is no custodial relationship); *but see Cox v. Malcom*, 60 Wn. App. 894, 900, 808 P.2d 758 (no special relationship between step-grandparent and step-grandchild), *review denied*, 117 Wn.2d 1014 (1991); *see also Johnson v. Los Angeles County*, 143 Cal. App. 3d 298, 191 Cal. Rptr. 704, 712 (1983) (special relationship created duty to affirmatively act where police released decedent from custody even though wife informed them that decedent was a paranoid schizophrenic who required immediate medica-

---

[6]Washington courts have recognized the following "special relationships":

"a school district toward a pupil, *McLeod v. Grant C[ounty] Sch. Dist. [No.] 128*, 42 Wn.2d 316, 319-22, 255 P.2d 360 (1953); an innkeeper to his or her guests, *Miller v. Staton*, 58 Wn.2d 879, 883, 365 P.2d 333 (1961) (duty of innkeeper to protect guests from criminal activity of other guests); a common carrier to its passengers, *Hutchins*, [116 Wn.2d] at 228; an employer to his or her employees, *Bartlett*[, 9 Wn. App.] at 621 ('employer has a duty to make reasonable provision against foreseeable dangers of criminal misconduct to which the employment exposes the employee')[ ]; a hospital to its patients; and a business establishment toward its customers. *See Hutchins*, [116 Wn.2d] at 228 (citing examples from PROSSER [AND] KEETON § 56, at 383)."

*Lauritzen*, 74 Wn. App. at 439-40 (footnote omitted).

tion to correct suicidal tendencies). Even when no "special relationship" originally existed, a duty may arise when a defendant interjects himself or herself into a situation and creates a special relationship of control. *See* PROSSER AND KEETON § 56, at 375-77.

Webstad concedes Susan Webstad did not have a traditional "special relationship" with Stortini. Nevertheless, he asserts that the facts of this case establish a "special relationship" that created a duty for Stortini either to avoid all circumstances that could lead Susan Webstad to choose to commit suicide or to seek medical assistance as soon as Susan Webstad decided to take her pills. Stortini did not, however, create the peril or Susan Webstad's dependent condition. Susan Webstad's voluntary willful choice to commit suicide created her peril and need for assistance.

Relying upon *Farwell v. Keaton*, 396 Mich. 281, 240 N.W.2d 217, 222 (1976), Webstad asserts that since Stortini and Susan Webstad were "companions on a social venture," a duty arose for Stortini to render assistance in the face of Susan Webstad's imminent peril. In *Farwell*, two men who were out drinking followed some young women, and six of the women's friends chased the two men, severely beating the decedent. *Farwell*, 240 N.W.2d at 219. The defendant drove the severely beaten decedent around for a couple of hours and then left him in the back seat of the car overnight, where he was discovered dead in the morning. *Farwell*, 240 N.W.2d at 219. The trial court observed that "[u]nder these circumstances, to say that [the defendant] had no duty to obtain medical assistance or at least to notify someone of [the decedent]'s condition and whereabouts would be 'shocking to humanitarian considerations' and fly in the face of 'the commonly accepted code of social conduct.' " *Farwell*, 240 N.W.2d at 222 (quoting *Hutchinson v. Dickie*, 162 F.2d 103, 106 (6th Cir.), *cert. denied*, 332 U.S. 830 (1947)).

Here, however, Stortini did not place Susan Webstad in a position of helplessness or prevent her from seeking

help from others. The evidence indicates that Stortini called for aid when Susan Webstad became helpless. *Farwell* is inapposite.

Webstad asserts that, as her employer, Stortini's having a romantic relationship with Susan Webstad, inviting her into his home, and serving alcohol to a known alcoholic gave rise to a "special relationship" duty of care under the reasoning in *Farwell*. Although Stortini had previously been Susan Webstad's employer, he was not her employer on the night of her death and their interaction on the night of her death was not work related, so no employer-employee "special relationship" existed here. *See Bartlett*, 9 Wn. App. at 621 ("employer has a duty to make reasonable provision against foreseeable dangers of criminal misconduct to which the employment exposes the employee").

■ Similarly, the fact that Susan Webstad was a social guest, a licensee, did not impose a "special relationship" duty on Stortini. *See Youngblood v. Schireman*, 53 Wn. App. 95, 103, 765 P.2d 1312, 25 A.L.R.5th 807 (1988) (no special relationship between home owner and guest creating a duty to warn that son would assault guest because home owner had no reason to foresee the assault). Washington also does not recognize a duty creating liability for a social host who provides intoxicating liquor to an intoxicated guest. *Burkhart v. Harrod*, 110 Wn.2d 381, 384, 755 P.2d 759 (1988) (no duty imposed upon social hosts for negligently serving alcohol to obviously intoxicated guests); *Cox*, 60 Wn. App. at 901 (no duty imposed upon defendant for providing alcohol to babysitter, who crashed car and severely injured defendant's step-grandchild); *cf. Estate of Kelly v. Falin*, 127 Wn.2d 31, 37-38, 896 P.2d 1245 (1995) (no duty imposed upon commercial establishment serving obviously intoxicated patrons).

■ "In general, courts will find a duty where reasonable persons would recognize it and agree that it exists." *Tallariti v. Kildare*, 63 Wn. App. 453, 456, 820 P.2d 952 (1991) (citing PROSSER AND KEETON § 53, at 359), *review*

*denied*, 118 Wn.2d 1012 (1992). The *Tallariti* court determined that a subcontractor and a general contractor had no duty when an employee collided with a motorist after drinking beer on the job site after hours. *Tallariti*, 63 Wn. App. at 456-60. "Changing social conditions lead constantly to the recognition of new duties." PROSSER AND KEETON § 53, at 359. This general tort concept has been applied in Washington.

■ For example, in *Strode v. Gleason*, 9 Wn. App. 13, 17, 510 P.2d 250, 60 A.L.R.3d 924 (1973), the court recognized a novel cause of action brought by a child's parents against the child's caregivers for alienation of the child's affections. The court observed: "[t]he common law has been determined by the needs of society and must recognize and be adaptable to contemporary conditions and relationships." *Strode*, 9 Wn. App. at 17. Nevertheless, we generally apply precedent to determine if there is a duty. *See Tallariti*, 63 Wn. App. at 460.

We have held that marriage vows do not create a legal duty between spouses to use reasonable care to avoid injury. *In re Marriage of J.T.*, 77 Wn. App. 361, 363-34, 891 P.2d 729 (1995). In *J.T.*, a former wife sought damages because her husband engaged in an extramarital affair, which caused her great distress because of the potential for HIV transmission. *J.T.*, 77 Wn. App. at 362, 365. We held that Washington does not recognize a legal duty to disclose extramarital sexual relations to one's spouse. *J.T.*, 77 Wn. App. at 365. Additionally, we determined that the husband and wife had no "special relationship" under the facts. *J.T.*, 77 Wn. App. at 364.

We have also held that no special relationship exists between a husband, as driver, and his wife, as passenger, requiring him to exercise reasonable care to protect her from a third party's criminal attack. *Lauritzen*, 74 Wn. App. at 438, 443-44.

■ Webstad cites no Washington authority for the contention that a duty arises when a romantic partner

commits suicide in response to her partner's actions. In fact, the cases of *J.T.* and *Lauritzen* lead us to the opposite conclusion.

Relying upon *Farwell*, Webstad also asserts that the facts of a specific case may create a duty. *Farwell* held that while the question of the scope of duty ordinarily is one of law, if a determination of duty depends on factual findings, then the jury must make that determination. *Farwell*, 240 N.W.2d at 219-20.

██ ██ In Washington, it is well established that "[u]nder traditional negligence principles, whether a particular class of defendants owes a duty to a particular class of plaintiffs is a question of law and depends on mixed considerations of 'logic, common sense, justice, policy, and precedent.' " *Keates v. City of Vancouver*, 73 Wn. App. 257, 265, 869 P.2d 88 (quoting *Hartley v. State*, 103 Wn.2d 768, 779, 698 P.2d 77 (1985) (additional citation omitted)), *review denied*, 124 Wn.2d 1026 (1994). Negligence cannot be inferred from the mere fact that an injury occurred. *See Hansen v. Washington Natural Gas Co.*, 95 Wn.2d 773, 778, 632 P.2d 504 (1981) (occurrence of injury was insufficient to prove dangerous condition establishing liability). We find no duty.

Webstad also contends that a "special relationship" duty to render assistance arose under the RESTATEMENT (SECOND) OF TORTS § 324 (1965), which states that:

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself [or herself] is subject to liability to the other for any bodily harm caused to him [or her] by[:]
>
> (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge
>
> . . . .

*See also* RESTATEMENT (SECOND) OF TORTS § 321 (1965) (an actor, who has affirmatively acted and then realizes or should realize that he or she has created an unreasonable risk of physical harm to another, has a duty to exercise reasonable care to prevent the risk from taking effect).

Although our courts have recognized that an individual must use reasonable care when warning others who are in danger and may be liable if harm is suffered because of another's reliance upon the undertaking, Washington has not adopted § 324 of the RESTATEMENT. *See generally Doyle v. Planned Parenthood of Seattle-King County, Inc.*, 31 Wn. App. 126, 130, 639 P.2d 240 (1982) (citing *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 299-300, 545 P.2d 13 (1975); RESTATEMENT (SECOND) OF TORTS § 323 (1966)). Thus, whether a duty exists to render assistance to a person who may be committing suicide when the suicide creates the risk of harm leading to reliance on another person is a question of first impression in Washington.

Citing a California decision, Webstad argues that a "special relationship" may arise when the defendant creates or increases the risk of injury to the plaintiff, or creates a dependent relationship, which induces reliance or prevents assistance from others. *People v. Oliver*, 210 Cal. App. 3d 138, 258 Cal. Rptr. 138, 143 (1989) (additional citation omitted). In *Oliver*, the court found liability for criminal negligence when the defendant took an extremely intoxicated man to her house, allowed him to use heroin, found him unconscious, dragged him behind her house where he could not be aided by others, and failed to summon aid. *Oliver*, 258 Cal. Rptr. at 144. The court found that the defendant was liable for the death, in part, because she took charge of a person unable to prevent harm to himself, creating a duty. *Oliver*, 258 Cal. Rptr. at 144 (citing RESTATEMENT (SECOND) OF TORTS § 324 (1965)).

Stortini distinguishes *Oliver*, noting that Susan Webstad came to Stortini's house of her own free will and was physically able to summon aid until she collapsed. Webstad, on the other hand, contends that Stortini "took charge" of Susan Webstad "when . . . he began debating alternatives as to the course of actions that should be taken after she ingested the pills" and that his failure to render aid to Susan Webstad prevented others from aiding her.

Webstad also argues that because of their relationship, Stortini's presence created an implicit assurance that he would aid Susan Webstad, thus preventing her from taking measures to aid herself.[7] He argues that because Stortini knew of Susan Webstad's suicidal tendencies and because they had a long-term relationship, she would expect assistance from Stortini when she was in peril. The record contains evidence that Stortini responded to a suicidal gesture Susan Webstad made in September 1989. Nevertheless, we cannot hold that, as a matter of law, Stortini's romantic relationship with Susan Webstad created any implied assurance that he would aid her.

Webstad asserts that because Stortini's behavior "set the stage" for her suicide, he had a duty to render aid. Once this duty was established, he argues that "the danger created by the defendant's negligence did invite rescue." *Maltman v. Sauer*, 84 Wn.2d 975, 981, 530 P.2d 254 (1975); *see Hutchinson*, 162 F.2d at 106-08 (defendant had duty to attempt to rescue intoxicated guest who fell overboard; no negligence found in decision to back up boat rather than turn it around).

Webstad concedes, however, that Stortini did not know what Susan Webstad ingested or what its effect would be. He nonetheless argues that a reasonable person would have concluded that a medical emergency arose when Susan Webstad took the pills.

While this may be true, we have held that Stortini had no duty to anticipate Susan Webstad's decision to attempt suicide before she collapsed and to prevent her from harming herself by immediately calling for help. We

---

[7]Webstad relies upon *Chambers-Castanes v. King County*, 100 Wn.2d 275, 286, 669 P.2d 451, 39 A.L.R.4th 671 (1983), for the proposition that some relationships carry implicit assurances. In *Chambers*, the Supreme Court considered whether, under the public duty doctrine, the police had a duty to provide assistance after a victim called for help. The Supreme Court now requires that a governmental entity make an *express* assurance, not an *implicit* assurance. *See Honcoop v. State*, 111 Wn.2d 182, 192, 759 P.2d 1188 (1988); *Noakes v. City of Seattle*, 77 Wn. App. 694, 698, 895 P.2d 842, *review denied*, 127 Wn.2d 1021 (1995). Likewise, a duty does not arise in a private relationship absent an express assurance.

decline to impose a legal duty to immediately summon aid whenever a person has reason to suspect that another person may be attempting suicide.[8] Susan Webstad created the risk of her own injury and the necessity that she rely on others to save her. Therefore, no "special relationship" existed because Stortini did not create or increase the risk of harm to Susan Webstad, or induce her reliance, or prevent her from seeking assistance from others. We thus conclude that Stortini and Susan Webstad did not have a "special relationship" giving rise to a duty for Stortini to protect her from herself.[9]

Affirmed.

BRIDGEWATER, J., concurs.

TURNER, J. (dissenting) — The Webstad family is entitled to their day in court. Susan Webstad was a person with known suicidal tendencies and a history of suicidal gestures. Stortini and Webstad had a pattern in which he would rescue and caretake following each such episode. Their relationship was marked by Webstad's divorce, treatment for depression and alcohol addiction, and her repeated suicide attempts when Stortini would not make a further commitment to her. Sufficient evidence exists to let the jury decide whether the history of rescues created a special relationship between Webstad and Stortini that gave Stortini the responsibility to further aid Webstad because she was relying on him to do so. Reasonable inferences can be drawn from the evidence that Stortini may have acted with deliberate indifference to Webstad's dire medical needs when, after undertaking to render aid, he

---

[8]We note that others might not have chosen to act as Stortini did, but he was under no recognized legal obligation to act differently. We again note that recognizing such a legal duty would be a significant change to state law, which, if appropriate, should be made by the Legislature.

[9]In light of our conclusion that Stortini owed no legal duty to Susan Webstad, we do not address whether Webstad could establish a breach of duty or causation. In addition, our determination that there was no duty renders Webstad's remaining arguments moot.

failed to take reasonably necessary steps to protect her, thereby increasing her risk of harm.

A "special relationship" may arise when one increases the risk of injury because of a dependency relationship which induces reliance or prevents assistance from others. *See People v. Oliver*, 210 Cal. App. 3d 138, 258 Cal. Rptr. 138, *review denied* (Aug. 17, 1989). Webstad's psychological ability to help herself was impaired, especially given the longstanding dependency relationship between herself and Stortini.

Given the nature of the Stortini/Webstad relationship, Stortini's presence at the scene of the emergency and knowledge of her peril created an implicit assurance that he would aid her, thus preventing her from taking measures to aid herself. Because Webstad knew he was aware of her suicidal tendencies, and because of his pattern of conduct during their relationship, she would expect assistance from him when in peril. The record contains evidence that Stortini responded promptly to a pill-taking suicide gesture she made in September 1989. He also took charge of Webstad's emotional and physical condition when, following a suicide attempt, he admitted her to a 12-day inpatient alcohol treatment program and brought her home upon completion.[10]

Stortini did not have a duty to aid his romantic partner merely because a medical emergency existed. A duty did arise, however, when he demonstrated to Webstad that he appreciated the gravity of her peril and undertook to render services to her by immediately offering to transport her to the hospital or to dial 911. Even where an offer to seek or render aid is implicit and unspoken, a duty to

---

[10]When intoxicated, Webstad repeatedly told Stortini that his on-again-off-again approach to their relationship and his failure to make a commitment greatly upset her. She talked about suicide quite often, especially when she had been drinking. On the night of her death, Webstad was drinking with Stortini at his residence. Stortini also played the film "See You in the Morning." It was about two couples who got divorced and remarried. The movie brought up the subject of commitment, and had certain parallels to their own relationship. Thus, Webstad became extremely angry and hysterical from Stortini's refusal to commit to their relationship.

make good on the promise has been found by most courts if it is reasonably relied upon. *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 301, 545 P.2d 13 (1975). The court in *Brown* adopted the RESTATEMENT (SECOND) OF TORTS § 323 (1965), which sets forth the standard to be applied in this case:

> One who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm,
>
> or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.[11]

Whether Webstad's special dependency relationship with Stortini reasonably induced her to rely to her detriment on his judgment to make medical decisions to save her is a triable issue of fact.

Another triable issue of fact is whether Stortini acted with deliberate indifference to Webstad's dire medical needs. He accepted at face value her reluctance to accept his offer to obtain medical help. He also failed to obtain competent medical advice. The evidence indicates that Stortini could easily have determined the type and quantity of drug she took. The empty medication bottle

---

[11]Comment (c), § 323, RESTATEMENT OF TORTS (SECOND) 1965, instructs: "*His motives in discontinuing the services are immaterial.* . . . Where however, the actor's assistance has put the other in a worse position than he was in before, either because the actual danger of harm to the other has been increased by the partial performance, or because the other, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the actor · is not free to discontinue his services where a reasonable man would not do so. . . ." (Emphasis added.)

was readily available.[12] Its label indicated the name of the medicine dispensed and the phone number of the pharmacy which dispensed it. If the medication bottle itself left any doubt, one or two samples had conveniently fallen into the sink. A phone call to Group Health's 24-hour number, any hospital emergency room, or poison control hotline would have provided access to a medical professional. Someone could have given Stortini a preliminary assessment of the danger of ingesting an overdose of Verapamil pills. He failed to make such a call, a reasonable step under the circumstances. He said he could not find a telephone book.[13] He did not call directory assistance or a telephone operator.

Had Stortini assessed the number of missing pills, or realistically assessed the danger, and contacted any number of easily available authorities, it is reasonable to assume aid would have been quickly dispatched. He was not oblivious to the type of intervention necessary. Stortini told the police that he remembered when this happened before, Webstad went to the hospital to have her stomach pumped, and after a couple of days she was fine.

A triable question of fact exists, as to whether Susan Webstad would have died if Stortini called 911 sooner. When Stortini, a public figure, finally did call 911, he asked twice that the response be made without lights or sirens.[14] A jury could infer that the same motivation that

---

[12]Stortini showed the empty bottle to a sheriff's deputy who arrived with the aid crew. The phone number of the pharmacy was on the label. The pill bottle was labeled: Verapamil — 100 count, dosage one tablet twice a day — and was dated 7/30/91. It could have been easily ascertained, assuming a normal dosage schedule, that roughly 52 pills were available for her to ingest.

[13]Stortini said that he could not find a telephone book because the house belonged to his late uncle..But he had been living in the home for several months.

[14]A transcript of the 911 call and a follow-up call by the 911 dispatcher reveals that Stortini twice asked the aid units to respond without sirens.. Excerpts from the transcript are as follows:

Stortini: A lady took some pills and I can't get her to wake up. I think they're blood pressure pills.

caused his concern about the sirens, also caused his delay in making the call in the first place.

If, as the medical examiner suggests, Susan Webstad's death resulted from a "suicide gesture gone wrong," this is a critical turning point. It could be inferred from the facts that Webstad's gesture was calculated to invite attention and rescue by Stortini. Webstad was a person with known suicidal tendencies and a history of suicidal gestures. She was visibly despondent, and conveyed that she wanted to die. She swallowed a handful of prescription drugs in the presence of Stortini and purportedly declined his offer to summon emergency medical assistance. A trier of fact could reasonably conclude that, given the history of their special dependency relationship, Webstad relied upon Stortini to recognize that further inquiry into the extent of her peril was necessary for her protection, and that she relied upon him to do at least this much to aid her. When she later began to feel ill and it was apparent to her that Stortini had done nothing, she overtly asked him to call Group Health. Stortini did not call.

Here, whether the dependency relationship between Webstad and Stortini induced her reliance on his judgment is relevant as to Stortini's liability for negligent performance of undertaking to render services. Stortini knew

---

Dispatcher: Do you think she might have overdosed on these?

Stortini: Yeah, I think so.

Dispatcher: [asks for address]

Stortini: [confirms address] . . . The light's on in the front. Can you come up without all the lights and sirens and things? I'll have the lights on and be out in front.

Stortini gives directions, says "She doesn't look good at all." and hangs up. Dispatcher calls back, establishes caller's name, and asks several questions.

Stortini: I think you better hurry here.

Dispatcher: OK, well....

Stortini: Try not to put the sirens on.

Dispatcher: Yeah, well, see, the Fire Department, they're already on their way.

of Webstad's suicidal tendencies and had rescued her before. This was an established pattern in the relationship. Stortini rescued Webstad and provided caretaking following her past suicidal, depressive, and alcohol related incidents.

The Medical Examiner determined Webstad's death to be a suicidal gesture gone wrong. What went wrong may have been Stortini's failure to rescue Webstad when they both understood that she was relying on him to do so. The trier of fact should determine whether Webstad's special relationship of dependency upon Stortini induced her to rely upon him to save her, and whether his abandonment of the undertaking until she fell unconscious placed her in greater unreasonable risk of serious harm.

Review denied at 131 Wn.2d 1016 (1997).