[No. 24075-1-II. Division Two. June 25, 1999.]

STOUFFER & KNIGHT, ET AL., *Appellants*, V. CONTINENTAL CASUALTY COMPANY, ET AL., *Respondents*.

*Guy Jeffrey Sternal* and *Angelia De An Harlow* of *Eisenhower & Carlson*, for appellants.

*David Martin Schoeggl* and *Tammy Lynn Lewis* of *Lane Powell Spears Lubersky L.L.P.*, for respondents.

Hunt, J. — Wayne Knight and his law partnership, Stouffer & Knight (Knight), appeal the trial court's grant of summary judgment to the firm's malpractice carrier, Continental Casualty Company (CNA). CNA denied insurance coverage when Knight's secretary embezzled money from a client's account. Holding that the trial court correctly applied the policy's exclusion for losses "arising from" the dishonest act of an employee, we affirm.

## FACTS

Wayne Knight was the attorney for Margaret Woodhams from 1988 until her death in 1996. Knight was responsible for her checking account and made checks on the account for Woodhams' expenses. Over time, Knight entrusted his secretary, Marsha Lachelt, with many of the tasks related to Woodhams' checking account: Lachelt prepared checks for Knight's signature, dispatched the checks, and maintained the records for the account.

Unbeknownst to Knight, in April 1991, Lachelt began embezzling from the account by altering checks after Knight had signed them and sometimes forging the payee's endorsement. Before being discovered in October 1995, Lachelt had embezzled approximately $250,000, causing an additional loss of approximately $40,000 in potential investment income. While Lachelt was embezzling, Knight failed to compare Woodhams' check register against the monthly checking account statements, which listed the amounts and payees of each check written on the account. Even a cursory comparison of the statements with the check register would have revealed Lachelt's alterations of the checks.

An errors and omissions professional insurance policy is-

sued by CNA[1] was in effect at the time of Lachelt's embezzlement. The policy provided coverage for "all amounts, up to our limit of liability, which you become legally obligated to pay as a result of a wrongful act by you or by any entity for whom you are legally liable." But the policy specifically excluded coverage for "any claim arising out of: . . . . any dishonest, fraudulent, criminal or malicious act or omission by you or any of your partners, officers, stockholders or employees."

Knight notified his insurance broker of the loss from Woodhams' account. The insurance broker passed the information on to CNA; the broker noted that he had suggested that Knight inquire about whether coverage existed under his other errors and omissions policy, issued by another insurer, because the CNA policy apparently provided no coverage for employee dishonesty. Bill Ramsey, a claim consultant for CNA, wrote to Knight, acknowledging receipt of Knight's claim and requesting further information. The next day, Ramsey again wrote to Knight,[2] explaining that CNA was investigating the claim under a reservation of rights[3] because the dishonest employee exclusion might preclude coverage. At Knight's request, CNA agreed to pay for Knight's choice of attorney to represent him in the matter and to carry out an investigation of his claim.[4]

After Knight informed them of Lachelt's theft,

---

[1]CNA is the umbrella organization for four firms: Continental Casualty Company; CNA Insurance Companies; CNA Financial Corporation; and Transcontinental Technical Services, Inc. For ease of reference, we refer to these collectively, as do the parties, as "CNA."

[2]The letter is dated October 8, 1995, but the parties agree that it was actually written and sent on November 8, 1995.

[3]An insurer's agreement to investigate a claim, or even defend an insured, under a "reservation of rights" indicates that, while the insurer is not rejecting the claim outright, it suspects that coverage may not exist for the claim, and so makes clear to the insured that lack of rejection of the claim does not necessarily mean that coverage will exist.

[4]A subsequent CNA internal memo to Ramsey indicated that: the dishonest employee exclusion precluded coverage for losses resulting from Lachelt's actions; CNA was considering revising the type of policy for which Knight had contracted; and if such revisions were ever actually made, employee theft probably would be covered.

Woodhams' estate and children made demands for full accounting and reimbursement of losses and damages incurred. After Knight met with Ramsey, CNA offered to settle for $125,000, despite maintaining its position that coverage was precluded. Knight refused to settle the claim for this amount.

CNA filed a declaratory action in federal court. The federal district court exercised its discretion, refused to accept jurisdiction, and dismissed the action. Knight filed suit in state court, alleging: (1) breach of contract; (2) a right to prejudgment interest under RCW 19.52.010; (3) eligibility for declaratory relief that CNA had a duty to defend and a duty to pay for any losses resulting from Lachelt's embezzlement; (4) violation of the Consumer Protection Act (CPA); (5) the tort of bad faith; (6) a right to attorney fees according to *Olympic Steamship Co., Inc. v. Centennial Insurance Co.*, 117 Wn.2d 37, 53, 811 P.2d 673 (1991); (7) negligence in failing to provide loss control services; (8) breach of the implied warranty of fitness for intended purpose; and (9) punitive damages. The trial court granted CNA's motion for summary judgment on the issue of coverage.[5]

Knight filed a motion to compel discovery, also seeking sanctions and vacation of the order dated January 14, 1997, in which the court had granted summary judgment to CNA on the coverage/exclusion issue. He claimed that CNA had refused to produce certain requested documents on grounds of relevance.[6] Later, in "an effort to avoid disputes," CNA produced several of these documents, while maintaining that Knight was not entitled to them.

---

[5]The trial court also granted CNA's motion for summary judgment on the issue of the aggregate limits under the policy, but that issue is not before this court.

[6]The information sought by Knight was general underwriting information and the draft of policies, not information on his own policy, as well as internal memoranda relating to CNA's investigation of Knight's claim; CNA argued that such information was irrelevant, under *Lynott v. National Union Fire Insurance Co.*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994), because this information had not been objectively manifested and communicated to Knight and thus could not be found to form the basis for the insurance contract.

By memorandum opinion dated February 12, 1998, the trial court granted summary judgment to CNA on Knight's remaining claims. The trial court also denied Knight's motions to compel, for sanctions, and to vacate the January 14, 1997, memorandum opinion. On March 17, 1998, the trial court entered an order dismissing with prejudice all of Knight's claims, and Knight appealed to the Supreme Court.[7] The Supreme Court transferred the case to us.

## ANALYSIS
### I. STANDARD OF REVIEW

■ We review de novo an order of summary judgment. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 394, 823 P.2d 499 (1992). Summary judgment is appropriate only if reasonable persons could reach but one conclusion, and there is no genuine issue of material fact. *Id.* at 394-95. Summary judgment in an insurance coverage case should be granted where (1) there is no dispute about the facts, and (2) coverage depends solely on the language of the insurance policy. *See Roller v. Stonewall Ins. Co.*, 115 Wn.2d 679, 682, 801 P.2d 207 (1990).

■ Interpretation of an insurance policy is a question of law, which we review de novo. *Id.* In construing an insurance policy, the policy should be given a fair, reasonable, and sensible construction, in a manner consistent with the way that the average person purchasing insurance would understand the policy language. *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 907, 726 P.2d 439 (1986).[8] "Exclusionary clauses contained in insurance policies are strictly construed against the insurer." *Allstate*

---

[7]Although Knight appears to appeal dismissal of all of his claims, he briefs, on appeal, only four of his original nine claims: (1) that losses resulting from Lachelt's embezzlement are covered under the policy; (2) negligent provision of loss control services; (3) bad faith on CNA's part; and (4) a right to attorney fees under *Olympic Steamship*. Thus, we address only the issues related to these four claims. *See State v. Dennison*, 115 Wn.2d 609, 629, 801 P.2d 193 (1990).

[8]The insurance contract

should be given a practical and reasonable rather than a literal interpretation; it should not be given a strained or forced construction which would lead to

*Ins. Co. v. Raynor,* 93 Wn. App. 484, 492, 969 P.2d 510, 975 P.2d 517 (1999).

## II. Coverage Under Language of the Policy

### A. Dishonest Employee Exclusion

An insurance company, as a private contracting entity, is generally permitted to limit the liability it assumes under its policies. *Findlay v. United Pac. Ins. Co.,* 129 Wn.2d 368, 379, 917 P.2d 116 (1996). The parties agree that Knight's negligent failure to supervise Lachelt was a "wrongful act" under the policy;[9] thus, absent an applicable exclusion, the losses caused by Lachelt's embezzlement would be covered by the policy. But an exclusion *does* apply.

The parties disagree about the effect of the dishonest employee exclusion: CNA argues that it unequivocally precludes coverage for the losses resulting from Lachelt's embezzlement; Knight argues that the exclusion applies only to the dishonest acts of "an insured," and that Lachelt, because she was not acting in the course of her employment when she was embezzling, is not "an insured" under the policy. In the alternative, Knight argues that the exclusion creates an ambiguity in the policy, which must be construed against CNA. Neither of Knight's arguments is persuasive.

### 1. Plain Language of Exclusion

As noted above, although the policy covers "wrongful acts" of those insured under the policy, it also excludes coverage for claims

> arising out of: . . . any dishonest, fraudulent, criminal or ma-

an extension or restriction of the policy beyond what is fairly within its terms, or which would lead to an absurd conclusion, or render the policy nonsensical or ineffective.

*E-Z Loader,* 106 Wn.2d at 907 (citation omitted).

[9]The policy defines, in relevant part, "wrongful act" as "any negligent act, error or omission in: A. the rendering of or failure to render, professional services[.]"

licious act or omission by you or any of your partners, officers, stockholders or employees.

CNA argues that "arising out of" excludes coverage for the losses resulting from Lachelt's actions; Knight responds that the exclusion applies only where an insured attorney is the dishonest actor.

"Insurance policies are to be construed as contracts, and interpretation is a matter of law. The entire contract must be construed together in order to give force and effect to each clause." *Washington Pub. Util. Dists.' Utils. Sys. v. Public Util. Dist. No. 1*, 112 Wn.2d 1, 10, 771 P.2d 701 (1989) (citations omitted). The court will enforce the contract as written if the language is clear and unambiguous. *Id.*

> The court will determine the parties' intent by viewing the contract as a whole, examining its purpose, objective, and subject matter, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their respective interpretations. The contract will be given a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or forced construction that leads to an absurd conclusion, or that renders the contract nonsensical or ineffective.

*Id* at 11 (citations omitted).

## 2. No Ambiguity

■ No ambiguity exists in Knight's CNA insurance contract[10] because "the language on its face" is *not* "fairly susceptible to two different but reasonable interpretations[.]" *See id.* at 11. The language of the policy does not

---

[10]Knight refers to two internal CNA memoranda to support his argument that the policy language is ambiguous; CNA replies that the trial court ruled that these memoranda were inadmissible, and that Knight did not challenge that ruling. CNA appears to be correct; moreover, these documents would not have been admissible because they did not form any part of the basis of the contract. *Lynott*, 123 Wn.2d at 684; *see also Safeco*, 118 Wn.2d at 405-06 (the insured cannot justifiably rely on words of the insurer of which the insured was unaware). Thus, although we need not consider these documents, even if we chose to examine them the outcome of the case would be unchanged.

support Knight's contention that the exclusion applies only where an insured attorney commits a dishonest act; rather, the language of the exclusion explicitly encompasses the acts of "employees" such as Lachelt.[11] The exclusion must be enforced "in order to give force and effect to each clause" of the policy. We reject Knight's interpretation because it directly contradicts the policy language and would effectively nullify the exclusion.

### 3. Causation

Under similar facts, similar arguments by the insured, and a similar CNA insurance policy, the Georgia Supreme Court held that the exclusionary clause precluded coverage for losses caused by embezzlement from a client account. *See Continental Cas. Co. v. H.S.I. Fin. Servs., Inc.*, 266 Ga. 260, 466 S.E.2d 4 (1996). Although that case involved theft by a law firm partner rather than a firm employee, the distinction is irrelevant under the language of the exclusionary clause here. Although not a Washington case, we find *H.S.I.* persuasive;[12] moreover, disregarding the exclusion would be inconsistent with prior Washington law.

---

[11]As CNA notes, the "arising out of" language is construed broadly: "The phrase 'arising out of' is unambiguous and has a broader meaning than 'caused by' or 'resulted from.' It is ordinarily understood to mean 'originating from', 'having its origin in', 'growing out of' or 'flowing from.' " *Avemco Ins. Co. v. Mock*, 44 Wn. App. 327, 329, 721 P.2d 34 (1986) (citation omitted). "To construe 'arising out of' as requiring a finding of 'proximate cause' before we would know whether the accident arose out of the [action covered by an exclusionary clause] does violence to the plain language of the policy. 'Arising out of' and 'proximate cause' describe two different concepts." *Toll Bridge Auth. v. Aetna Ins. Co.*, 54 Wn. App. 400, 407, 773 P.2d 906 (1989). Here, Knight's reimbursement to the Woodhams', for which he now seeks coverage from CNA, clearly arose out of Lachelt's dishonest/criminal act. That the reimbursement also arguably arose out of his own negligent failure to supervise Lachelt does not change the fact that the exclusionary clause precludes coverage.

[12]CNA argues that *H.S.I.* is consistent with prior Washington law, namely *Farmers Ins. Co. v. Hembree*, 54 Wn. App. 195, 773 P.2d 105 (1989). *Hembree* concerned a couple being sued for negligence, and their minor children being sued for intentional acts, arising from the minor children's molestation of children in the parents' care. The policy in question excluded coverage for intentional acts; thus, it was clear that no coverage existed for the actions of the children. But the couple argued that the policy nonetheless covered their negligent supervi-

Knight argues that his negligent failure to supervise Lachelt enabled her to embezzle from Woodhams' account. While this may be true, nevertheless, the loss was a direct result of Lachelt's embezzlement, a dishonest and criminal act.[13] Knight's reliance on *McMahan & Baker, Inc. v. Continental Casualty Co.*, 68 Wn. App. 573, 843 P.2d 1133 (1993), is misplaced. The *McMahan* court held that an exclusionary clause containing "arising out of" language did not preclude coverage where the clause excluded coverage for claims arising from one type of error and the complaint against the insured sought damages mainly for other types of omissions. *Id.* at 579. That the firm had engaged in an act implicating the exclusionary clause did not preclude coverage because that act was not alleged to have caused the damage. Here, by contrast, the excluded act, namely the secretary's criminal embezzlement, was the direct cause of Woodhams' claims against Knight. Therefore, *McMahan* does not apply.

We acknowledge that generally an exclusion should be read narrowly to avoid defeating coverage that an insured reasonably expects. *McDonald Indus., Inc. v. Rollins Leasing Corp.*, 95 Wn.2d 909, 915, 631 P.2d 947 (1981). But here, given the explicit language of the dishonest employee exclusionary clause, Knight had no reasonable expectation of coverage. Thus, we hold that the trial court correctly ruled that there is no CNA policy coverage for losses resulting from Lachelt's embezzlement.

sion of their own children, which allowed the molestation to take place. Because of a provision precluding coverage for all those insured under the policy where coverage was precluded for "an insured," Division One found that coverage was precluded for the parents' negligence as well. Thus, while *H.S.I.* is consistent with *Hembree*, the *Hembree* court had a different focus and was interpreting different policy language; Knight argues that this difference in focus makes *Hembree* inapposite. But CNA is correct that *Hembree* is a good analogy because it illustrates that an exclusionary clause can preclude coverage, not only for the intentional acts directly leading to the losses at issue, but also for the negligence that perhaps facilitated the occurrence of those acts.

[13]As CNA notes, agreeing with Knight's argument would effectively eliminate the exclusion because whenever an employee commits a dishonest/criminal act, allegations framed in negligence can always be claimed against the employee's superiors.

## B. Efficient Proximate Cause—Negligent Failure to Supervise

■ Knight argues: "It is the negligence of Knight that set in motion the chain of events that le[]d to the losses to Margaret Woodhams' estate. Knight's negligence is the efficient proximate cause of the loss." CNA responds that the efficient proximate cause rule is inapplicable because Knight's failure to supervise did not set in motion Lachelt's embezzlement. We agree with CNA.

The Washington State Supreme Court has defined the efficient proximate cause rule as follows:

> "Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought, the insured peril is regarded as the "proximate cause" of the entire loss.
>
> "It is the efficient or predominant cause which sets into motion the chain of events producing the loss which is regarded as the proximate cause, not necessarily the last act in a chain of events."

*Findlay,* 129 Wn.2d at 372 (quoting *Graham v. Public Employees Mut. Ins. Co.*, 98 Wn.2d 533, 538, 656 P.2d 1077 (1983)). The efficient proximate cause rule has not been applied in Washington under facts like these, and we are not persuaded to extend it to this case.

But even were we to apply it here, coverage would still be precluded. As noted above, an efficient proximate cause is the *predominant cause* which sets in motion other causes which, in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought. *Findlay,* 129 Wn.2d at 372. Knight's negligence did not "set into motion" an "unbroken sequence" of events that led to the losses to Woodhams' account. On the contrary, Lachelt committed independent, intentional dishonest/criminal acts, which, even if efficient proximate cause analysis were applied, would unquestionably be the

efficient proximate cause of the loss for which Knight now seeks coverage.

Under similar facts, the Maryland Court of Appeals found that, where money is stolen from a client account, negligent failure to supervise the thief adequately cannot be said to be the proximate cause of the losses caused by the theft:

> In terms of proximate causation, the dishonest and criminal act of [the thief] in misappropriating the . . . funds was, of course, the direct and precipitating cause of the loss; no loss would have occurred had [the thief] not stolen the money. Although the negligence of [the insured] may have facilitated [the thief's] theft of the funds and been a contributing cause of the loss in that sense, it was indirect and remote at best. That [the insured] may have been liable for his negligence to the [client from whose account funds were stolen] does not determine whether his liability is within the coverage of the policy; the terms of the policy determine the reach and extent of its coverage. In this connection, principles of causation will not be applied to defeat the intent of the parties . . . . We think the parties intended, from the language used in the insurance contract construed as a whole, that any loss which resulted from any dishonest or criminal act of the insured's partner was excluded from coverage, and that the exclusionary clause of the policy was all-encompassing in this respect.

*Aragona v. St. Paul Fire and Marine Ins. Co.*, 281 Md. 371, 378 A.2d 1346, 1350-51 (1977).[14]

### III. LOSS CONTROL SERVICES

 Knight next alleges liability on CNA's part for negligent provision of loss control services. A cause of action for negligence requires the plaintiff to establish four elements: (1) the existence of a duty owed; (2) breach of that duty; (3) injury resulting from that breach; and (4) a proximate cause between the breach and the injury. *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994). The threshold determination,

---

[14]Knight's attempt to distinguish *Aragona*, on grounds that the thief there was a partner, whereas the thief here was merely an employee, is a distinction without a difference under the terms of the policy language.

whether a duty exists, is a question of law. *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996). "The existence of a duty may be predicated upon statutory provisions or on common law principles." *Id.* at 49. "When no duty of care exists, a defendant cannot be subject to liability for negligent conduct." *Webstad v. Stortini*, 83 Wn. App. 857, 865, 924 P.2d 940 (1996).

Under the common law, a person does not have a duty to protect others from the criminal acts of third parties absent a "special relationship." *Id.* at 865-67. Washington courts have recognized "special relationships" only in circumstances that were protective in nature, i.e., where the relationship involved an element of entrustment. *Id.* at 869.

Knight does not allege facts necessary to establish a special relationship between himself and CNA. The only contract between the two parties is the insurance policy, which makes no provision for loss control services. In all other cases where an insurer has been found liable for negligent performance of loss control services, the insurer was paid additional compensation for providing loss control services, above and beyond the regular insurance premiums. *See, e.g., Price v. Management Safety, Inc.*, 485 So. 2d 1093 (Ala. 1986).

Here, CNA sponsored loss control workshops and newsletters for its insureds for its own benefit. Insureds did not pay extra for these educational services; instead, CNA reduced premiums for insureds who participated. Knight's partner, Rush E. Stouffer, confirmed that CNA's seminars and newsletters played no role in his choice of insurance carrier. Knight and Stouffer both admitted that neither ever expected CNA to audit the firm's books in order to assure that there were no irregularities.

The evidence is undisputed that CNA never undertook provision of loss control services for Knight. Thus, CNA owed no duty to provide loss control for Knight, and, as a matter of law, Knight cannot maintain an action against

CNA based upon negligent provision of loss control services.[15]

## IV. BAD FAITH

Knight also alleges bad faith on the part of CNA. Insurers defending under a reservation of rights have an "enhanced obligation" to their insureds. *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 387, 715 P.2d 1133 (1986). The insurer can fulfill its enhanced obligation by meeting four criteria:

> First, the company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries. Second, it must retain competent defense counsel for the insured. Both retained defense counsel and the insurer must understand that only the *insured* is the client. Third, the company has the responsibility for fully informing the insured not only of the reservation of rights defense itself, but of *all* developments relevant to his policy coverage and the progress of his lawsuit. . . . Finally, an insurance company must refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.

*Id.* at 388.

In order to establish a bad faith breach of an insurance contract, the insured must show that the breach was "unreasonable, frivolous, or unfounded." *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 560, 951 P.2d 1124 (1998). An insured may maintain an action against an insurer for bad faith investigation of the insured's claim and violation of the CPA, regardless of whether the insurer was ultimately correct in denying coverage under the policy. *Coventry As-*

---

[15]Knight also argues that CNA's conduct created a duty to provide loss control services, based upon section 323 of the RESTATEMENT (SECOND) OF TORTS. This argument fails because this so-called "good Samaritan" section of the RESTATEMENT requires that the defendant actually have undertaken the action alleged to have led to the loss. If an insurer does not inspect, it incurs no responsibility to either the insured or an injured third party. *Sheridan v. Aetna Cas. & Sur. Co.*, 3 Wn.2d 423, 433, 100 P.2d 1024 (1940). Here, it is undisputed that CNA never examined the firms' accounts; thus section 323 is clearly inapplicable.

*soc. v. American States Ins. Co.*, 136 Wn.2d 269, 279, 961 P.2d 933 (1998). But it is not bad faith for an insurer to deny coverage based on a reasonable interpretation of the insurance policy. *Kirk*, 134 Wn.2d at 560.

Knight argues that bad faith is established as a matter of law because CNA failed to conduct an independent investigation of his claims and coverage. Not only does Knight cite no authority for this proposition, but also his argument would lead to an absurd result under the facts of this case. Here, CNA paid the attorney of Knight's choice to investigate the claim. Knight acknowledged that: (1) he had originally retained this attorney to represent him in all aspects of this claim; (2) it was at his request that CNA paid the attorney fees; and (3) he was satisfied with the investigation done by his attorney and believed that his attorney had done a good job. Thus, the record supports the assertion of Knight and his attorney that the attorney's representation was no less zealous because CNA was paying his fees. Knight has failed to show harm to himself and, thus, bad faith on the part of CNA. CNA has satisfied the four *Tank* factors. We therefore uphold the trial court's dismissal of this claim.

## V. ATTORNEY FEES

Finally, Knight argues that he is entitled to attorney fees. If an insurer forces an insured either to bring or to defend a declaratory judgment action, and the insured prevails, the insured is entitled to an award of attorney fees. *Olympic S.S. Co.*, 117 Wn.2d at 53. But here, the converse is true: Knight has not prevailed, and therefore he is ineligible for *Olympic Steamship* attorney fees.

We hold that: (1) the dishonest employee exclusion unambiguously precludes coverage; (2) the efficient proximate cause rule is inapplicable; (3) there is no basis in fact for an action based upon negligent provision of loss control services; (4) the trial court correctly found that CNA had not acted in bad faith; and (5) Knight is not entitled to attorney fees. Affirmed.

BRIDGEWATER, C.J., and ARMSTRONG, J., concur.

Review denied at 139 Wn.2d 1018 (2000).