106 P.3d 815 (2005)
COLORADO STRUCTURES, INC., a Colorado corporation, licensed to do business in Washington d/b/a CSI Constr. Company, Respondent/Cross-Appellant,
v.
INSURANCE COMPANY OF THE WEST, a California corporation, Star Insurance Company, a Michigan corporation, Action Excavating and Paving, Inc., an inactive Oregon corporation, and Marlowe Heinz, personally, Appellants/Cross-Respondents.
No. 30201-2-II.
Court of Appeals of Washington, Division 2.
February 15, 2005.
*817 Joseph C. Calmes, Magnus Rune Andersson, c/o Hanson, Baker, Ludlow, Drumheller PS, Bellevue, WA, for Appellants/Cross-Respondent.
Nell Anne Oram, Tigard, OR, Jeffrey Kenneth Hanson, Yazbeck Cloran & Hanson LLC, Portland, OR, for Respondent/Cross-Appellant.
Ford Douglas Ruud, Seattle, WA, for Amicus Curiae Surety Assoc. of America.
*816 MORGAN, A.C.J.
This case requires us to construe a subcontractor's performance bond. The main question is whether the surety's liability was conditioned on the obligee's having declared, before the principal substantially completed the work, that the principal was in default under the subcontract. The trial court answered no, and so do we. We affirm, except that we modify the trial court's award of attorney fees.
Colorado Structures, Inc. (CSI) contracted with Wal-Mart to build a large retail store in Vancouver, Washington. CSI was to finish by September 1998, so that the store could open on October 14, 1998. CSI was subject to significant penalties if the store did not open on time.
In February 1998, CSI formed two subcontracts with Action Excavating and Paving, Inc. (Action). One was for offsite work, and the other was for onsite work.
The offsite subcontract is the one primarily in issue here. It required Action to build a sewer system for $472,290. Action was to start in May and finish in July. The City of Vancouver was to test and approve the work. The offsite subcontract provided in part:
If, in the opinion of the Contractor [CSI], the Subcontractor [Action] . . . fails to carry on the Work in a manner acceptable to the Contractor, then the Contractor shall have the right and may . . . after giving the Subcontractor two (2) days written notice thereof, terminate this Subcontract whereupon the Contractor may take over and complete the performance of the Work by whatever method and means it may deem expedient[.][1]
On April 8, 1998, Insurance Company of the West (ICW) issued a performance bond and a payment bond in exchange for $8,034. *818 In the performance bond, ICW guaranteed to CSI that Action would perform the offsite subcontract.[2] In the payment bond, ICW guaranteed to CSI that Action would pay the laborers and materialmen on the offsite contract. The performance bond is the one in issue here, and it reads as follows:
[A] Action Excavating & Paving, Inc.. . ., hereinafter called Principal, and Insurance Company of the West . . ., hereinafter called Surety, are held and firmly bound unto CSI Construction Co. . . ., hereinafter called Obligee, in the amount of . . . $472,290. . .
[B] WHEREAS, Principal has . . . entered into a subcontract with Obligee . . ., which subcontract is by reference made a part hereof, and is hereinafter referred to as the subcontract,
NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH THAT, if Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.
[C] Whenever Principal shall be, and declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:
(1) Surety may promptly remedy the default, subject to the provisions of paragraph 3 herein, or;
(2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;
(3) The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by the Obligee, and the reasonable cost exceeds the balance of the subcontract price, the Surety shall pay to the Obligee such excess, but in no event shall the aggregate liability of the Surety exceed the amount of this bond. If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and to reimburse the Surety for its outlays shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the subcontract. The term "balance of the subcontract price," as used in this paragraph, shall mean the total amount payable by Obligee to Principal under the subcontract and any amendments thereto, less the amounts heretofore properly paid by Obligee under the subcontract.
[D] Any suit under this bond must be instituted before the expiration of two (2) years from date on which final payment under the subcontract falls due.
[E] No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators or successors of Obligee.[3]
For ease of reference, we have inserted capital letters at the beginning of each major paragraph.
Action began the offsite work and claimed progress payments that CSI made. By the end of June, however, Action was "seriously behind schedule."[4] CSI decided not to terminate Action's contract, but instead to help Action perform. CSI supplemented Action's crews and took other steps intended to minimize expense and delay.
"Action continued performing . . . and substantially completed it[s] work on or about October 14, 1998."[5] The City allowed Wal-Mart to open the same day. The City required, however, that CSI put money into escrow to insure that defects in Action's work would be repaired. CSI ultimately paid an *819 additional $417,172 "to complete and repair Action's Off-site work."[6]
Meanwhile, on September 9, 1998, CSI copied ICW on a letter stating that although Action would finish "by . . . September 18, 1998,"[7] it would leave many defective and incomplete items. On September 18, 1998, CSI notified ICW that the City had rejected some of Action's work, that CSI was still supplementing Action's crews, and that CSI would "be looking to the ICW Group for compensation of costs which exceed Action Excavating's subcontract agreement and change orders."[8] On October 9, 1998, CSI notified ICW that the cost of supplementing Action's performance would exceed the remaining balance on the offsite subcontract, and that CSI would be asking ICW to pay the difference. On November 25, 1998, CSI declared that Action was in default and demanded that ICW pay as provided in the performance bond. ICW refused to pay because CSI had not formally declared Action to be in default before Action had substantially completed the work.
CSI sued ICW, Action, and Action's owner. ICW answered and denied liability. Action and its owner defaulted.[9] The trial court denied ICW's motion for summary judgment, and this court denied discretionary review.
A bench trial was held. ICW again took the position that it was not liable because CSI had not formally declared Action in default before Action had substantially completed the work on the offsite subcontract. ICW also contended that CSI had paid Action too much in progress payments, thereby impairing ICW's security and reducing ICW's liability. CSI claimed prejudgment interest. CSI also claimed reasonable attorney fees based on the offsite subcontract, which the performance bond incorporated, and on the Olympic Steamship[10] case. The trial court ruled that "Action was in material breach" of the offsite subcontract; that CSI had not been required to formally declare a "default"; that CSI had given ICW "adequate notice" of Action's problems; that CSI had not "unreasonably impaired ICW's collateral"; that CSI had incurred damages of $417,172; and that CSI could not claim prejudgment interest because its damages had not been "liquidated" until trial.[11] The trial court granted reasonable attorney fees to CSI under the subcontract, which the bond incorporated, but ruled that the combination of damages and fees could not exceed the amount of the bond. The trial court denied CSI's claim for reasonable attorney fees under the Olympic Steamship[12] case. The trial court entered judgment for $417,172, plus reasonable attorney fees of $55,118, for a total of $472,290.
ICW appeals, and CSI cross-appeals. ICW claims (1) that it is not liable on its bond, and (2) that even if it is, it is not liable for as much as the trial court assessed. CSI claims that it is entitled (1) to prejudgment interest, and (2) to reasonable attorney fees under Olympic Steamship even if such fees exceed the amount of the bond.

I.
The first issue is whether ICW is liable on its bond. ICW claims it is not, "because CSI did not declare Action in default before substantial completion of the bonded offsite contract."[13] According to ICW, its "liability on its bond was conditioned on a declaration of default from CSI," CSI did not make such a declaration, and thus ICW cannot now be liable.[14] CSI responds in part that it declared Action to be in default.
*820 A bond is a contract that governs the surety's liability to the obligee.[15] It is interpreted using general principles of contract construction and performance.[16] Here then we (A) review relevant contract principles, (B) examine the bond's terms, and (C) apply the results to ICW's claim.

A.
We turn first to relevant contract principles. A contract, including a bond, should be construed as a whole[17] and, if reasonably possible, in a way that effectuates all of its provisions.[18] If unambiguous, it should be construed in accordance with the parties' plain intent.[19] If ambiguous, it should be "construed in favor of liability of the surety."[20]
A contract, including a bond, can contain conditions as well as promises. A condition is an event that must occur, or a circumstance that must exist, in order for the promisor to have a duty to perform.[21] A promise is a "manifestation of intention to act or refrain from acting in a specified way."[22]
A condition is classified according to its origin and effect. It can be express, implied in fact, or constructive.[23] It is "precedent" if its occurrence triggers a duty of performance that had not arisen previously, but "subsequent" if its occurrence defeats a duty of performance that had arisen previously.[24]
When a contract provision is both a condition and a promise, the remedies available for its breach vary by whether the breach is "material." If the breach is "material," the promisee has an election: He or she may treat the breach as a failure of a condition that excuses further performance, and thus terminate the contract;[25] or, he or she may waive the condition and allow performance to continue.[26] Regardless of whether the breach is "material," the promisee can recover damages.[27] As one authority explains:
Any unjustified failure to perform when performance is due is a breach of contract which entitles the injured party to damages. If the breach is slight or insubstantial, *821 it is called a partial breach, for which plaintiff's damages are restricted to compensation for the defective performance. If the breach is material, it is called a total breach, which gives to the injured party an election to substitute for his contractual rights the remedial right to damages for total failure of performance. He has the alternative election of treating the contract as continuing, however, in which case his damages are limited as for a partial breach.[28]

B.
Having reviewed relevant contract principles, we next examine the bond. It incorporates the offsite subcontract by reference,[29] so the two must be read together. Action is both the bond principal and subcontract promisor; CSI is both the bond obligee and subcontract promisee; and ICW is the bond surety. The bond was quoted above.
By its plain terms, Paragraph A of the bond makes ICW immediately liable to CSI. It states that ICW is "held and firmly bound unto CSI ... in the amount of ... $472,290."[30]
By its plain terms, Paragraph B conditions the liability created by Paragraph A on one  and only one  express condition subsequent. Paragraph B states that "the condition of this obligation is such that, if [the] Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect."[31] By using the word "condition" in its singular form, Paragraph B manifests that the liability created by Paragraph A is subject to only one condition  that the principal "promptly and faithfully perform" the offsite subcontract. By using the word "otherwise," which we have italicized, Paragraph B expressly eliminates all other conditions. Read together, Paragraphs A and B state that the surety's obligation commences when it executes the bond[32] and continues until the principal promptly and faithfully performs.[33]
When Paragraph C applies, it provides for certain remedies and measures of damage.[34] By its terms, however, it applies only when (1) the principal is "in default under the subcontract";[35] (2) the obligee declares the principal to be in default under the subcontract; and (3) the obligee has performed its own obligations under the subcontract. It does not apply, by negative but necessary implication, under other circumstances. Under other circumstances then, one looks to the common law for remedies and measures of damage.[36]

C.
With this background, we turn to ICW's claim that it is not liable on the bond because CSI failed to declare a "default." To analyze that claim, we make several inquiries. (1) Did Action materially breach the offsite contract? (2) Did CSI declare Action to be in default under the offsite subcontract? (3) If CSI did not declare Action to be in default, did it fail to fulfill an obligation imposed by law? (4) If CSI did not declare Action to be in default, did it breach a promise made in the offsite subcontract or the bond? (5) If CSI did not declare Action to be in default, did it fail to fulfill a condition included in the *822 offsite subcontract and thereby relieve ICW of its duty to pay under the bond? After making these inquiries, we briefly examine the payment bond and a particular case on which ICW is relying.

1.
Our first inquiry is whether Action materially breached the offsite contract. The trial court so determined, and no one assails that determination in this appeal. Accordingly, we hold that Action materially breached the offsite contract.

2.
Our second inquiry  whether CSI declared Action to be in default under the subcontract  has three parts. (a) When is a principal in default under a subcontract? (b) When does an obligee "declare" a principal to be in default under a subcontract? (c) Did CSI make such a declaration here?
Turning to (a), we distinguish between "breach" and "default." Utilizing the concept of "material breach" that we discussed above, the Fifth Circuit explained in L & A Contracting Co. v. Southern Concrete Services, Inc.:[37]
Although the terms "breach" and "default" are sometimes used interchangeably, [[38]] their meanings are distinct in construction suretyship law. Not every breach of a construction contract constitutes a default sufficient to require the surety to step in and remedy it. To constitute a legal default, there must be a (1) material breach or series of material breaches (2) of such magnitude that the obligee is justified in terminating the contract. [[39]]
Agreeing with L & A in this respect,[40] we hold that a principal is "in default under the subcontract" if he or she materially breaches the subcontract, thereby permitting (but not requiring) the obligee to terminate or cancel the subcontract.
The answer to (b) follows logically from the answer to (a). If a principal is "in default under the subcontract" when he or she has materially breached the subcontract, thereby permitting but not requiring the obligee to terminate the subcontract, an obligee "declares" a principal to be in default when, having elected to treat the breach as "material," the obligee announces his or her intent to terminate the subcontract.
Turning to (c), we observe that even though Action's breach was material, CSI never elected to treat it as such. Nor did CSI declare an intent to terminate the offsite subcontract. Instead, CSI opted to continue Action's performance and seek damages at the end. Necessarily then, CSI did not declare Action to be in default under the offsite subcontract.

3.
Our third inquiry is whether CSI, by not declaring Action to be in default, failed to fulfill an obligation imposed by law. As discussed above, the law permits but does not require a non-breaching promisee/obligee to declare a default (i.e., to declare a material breach and announce its intention to terminate the contract). Instead, the law gives the promisee/obligee the option to declare a default, terminate the contract, and sue for damages (if any) incurred to date; or, alternatively, to continue the contract in effect and sue for damages incurred when performance is finished. By electing the latter course of action, CSI did not fail to fulfill an obligation imposed by law.

4.
Our fourth inquiry is whether CSI, by not declaring Action to be in default, breached a promise made in the offsite subcontract or in the bond. Like the law itself, the subcontract gave CSI the option to declare a default, but it did not obligate CSI to declare a default or terminate the subcontract; as quoted above, it stated only that if Action *823 failed to perform, CSI "may ... terminate this Subcontract."[41] The only place in which the bond even mentions a declaration of default is Paragraph C, which merely recognizes and describes the remedies that follow from a declaration of default. By failing to declare a default, CSI did not breach a promise made in the subcontract or the bond.

5.
Our fifth inquiry is whether CSI, by not declaring a default, failed to fulfill a condition to ICW's liability and thereby relieved ICW of its duty to pay on the bond. As discussed above, Paragraph A of the bond makes ICW liable to CSI. Paragraph B explicitly states that ICW will continue to be bound until Action promptly and faithfully performs. By using the word "otherwise," Paragraph B explicitly eliminates all other conditions  including a declaration of default by CSI. The preamble to Paragraph C sets forth three events (the principal's default, the obligee's declaration of default, and the obligee's performance) that constitute conditions precedent to the use of the remedies and damages described in Paragraph C, but not conditions precedent to the liability created in Paragraph A.[42] ICW's liability on the bond was not conditioned on a declaration of default, and CSI's failure to make such a declaration did not relieve ICW of its duty to pay on the bond.
An examination of ICW's payment bond confirms these conclusions, for it clearly demonstrates that ICW could have added  but did not add  conditions to Paragraph A of the performance bond. Issued simultaneously with the performance bond, the payment bond states in part:
[A] Action Excavating & Paving, Inc ...., hereinafter called Principal, and Insurance Company of the West ..., hereinafter called Surety, are held and firmly bound unto CSI Construction Co. ..., hereinafter called Obligee, for the use and benefit of claimants as hereinbelow defined, in the amount of ... $472,290 ...
[B] WHEREAS, Principal has ... entered into a subcontract with Obligee ..., which subcontract is by reference made a part hereof, and is hereafter referred to as the subcontract.
NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the subcontract, then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions ... [[43]]
ICW relies heavily on L & A Contracting v. Southern Concrete Services,[44] a 1994 Fifth Circuit case.[45] Southern, a subcontractor and bond principal, "failed to provide sufficient concrete ... in a timely manner and breached the subcontract in numerous other particulars."[46] L & A, a general contractor and bond obligee, demanded that F & D, the bond surety, "`take the necessary steps to fulfill this contract to prevent any further *824 delays and costs[.]'"[47] Rather than opting to declare a default and terminate Southern's subcontract, L & A allowed Southern to complete its performance, then sued Southern and F & D for damages based on Southern's failure to promptly and faithfully perform. The trial court found that Southern had breached the subcontract and granted judgment against both defendants.
On appeal, the Fifth Circuit failed to analyze the bond's language.[48] Instead, it began by asserting:
We turn first to F & D's appeal. As a surety, F & D's liability is governed by the terms of its bond with L & A. While Southern is, of course, directly liable for its own breach of contract, the bond in this case imposes liability on F & D for Southern's breach only if two conditions exist. First, Southern must have been in default of its performance obligations under the subcontract. Second, L & A must have declared Southern to be in default. [[49]]
The Fifth Circuit concluded that because L & A had failed to declare a default, the second of these conditions had failed, thereby relieving F & D of its duty to perform on the bond.
The linchpin of the L & A court's conclusion is its assertion, italicized above, that the events described in the preamble to Paragraph C condition not just the use of the remedies described in Paragraph C, but also the liability described in Paragraph A.[50] To so hold, however, plainly violates the language of the bond. As already discussed, Paragraphs A and B of the bond create liability, subject to a single express condition subsequent (the principal's prompt and faithful performance). By using the word "otherwise," Paragraph B explicitly eliminates any other conditions on liability. Paragraph C imposes express conditions precedent (including that the principal be "in default" and that the obligee have declared the principal to be in default) on the use of the remedies described therein, but not on the liability described in Paragraphs A and B. Believing that L & A was wrongly decided,[51] we decline to follow it except as already indicated.[52]
Concluding our discussion of the first issue, we reject ICW's claim that it cannot be liable because CSI opted to continue Action's contract instead of declaring Action to be in default; we agree with the trial court that "CSI gave ICW adequate notice"[53] under Washington law;[54] and we hold that ICW is liable on the performance bond.

II.
ICW claims that even if it is liable on the performance bond, the trial court ordered it to pay too much. ICW reasons that it had a security interest in the unearned balance on the offsite subcontract; that CSI squandered that balance by making progress payments to Action in excess of the value of Action's then-completed work; and *825 that its (ICW's) liability should have been reduced accordingly. ICW also contends that it was improperly made to bear the burden of proving that its security had been impaired.
In Puyallup Valley Bank v. Mosby,[55] this court discussed the applicable principles of suretyship law, though in a somewhat different context. It said:
[I]f the principal's debt to the creditor is secured by property of the principal, the surety acquires by operation of law a kind of property interest in the collateral securing the primary debt. National Bank v. Equity Investors, 86 Wash.2d 545, 546 P.2d 440 (1976).... If the creditor impairs the value of the collateral, he discharges the guarantor to the extent of the impairment. Equity Investors, 86 Wash.2d at 556, 546 P.2d 440; Langeveld v. L.R.Z.H. Corp., 74 N.J. 45, 376 A.2d 931 (1977); Restatement of Securities (1941).
Whether the creditor has unjustifiably impaired the collateral is a question of fact. Lyons v. Citizens Comm'l Bank, 443 So.2d 229 (Fla.Dist.Ct.App.1983). The guarantor seeking discharge has the burden of proving both the existence and the extent of impairment. Lyons v. Citizens Comm'l Bank, supra; Rempa v. LaPorte Prod. Credit Ass'n, 444 N.E.2d 308 (Ind.Ct.App.1983).[[56]]
In this case, the trial court determined, "[b]ased upon the totality of all evidence adduced at trial, [that] ICW failed to prove that CSI unreasonably impaired ICW's collateral, represented by the subcontract balance owed by CSI to Action for the Off-site work."[57] In making this determination, the trial court properly required ICW to bear "the burden of proving both the existence and the extent of impairment."[58] The trial court also resolved the dispositive question of fact  whether CSI had squandered ICW's security by making progress payments to Action in excess of the value of Action's then-completed work  in a way that the record supports, notwithstanding ICW's claims to the contrary. We find no error.

III.
CSI claims that it is entitled to prejudgment interest because its damages were liquidated.[59] The trial court determined that CSI failed to prove that its damages were liquidated, and the record supports that determination. We reject this claim.

IV.
CSI claims that it is entitled to reasonable attorney fees under Olympic Steamship,[60] and that such fees can exceed the amount of the bond. Although the trial court recognized that Olympic Steamship applies to surety bonds, it ruled that "the evidence does not present a `coverage question' ";[61] thus, it declined to award fees under Olympic Steamship. The court granted fees under the offsite subcontract,[62] which the bond incorporates by reference, but it limited such fees to the amount of the bond. Finding Olympic Steamship dispositive, we do not reach the subcontract.
In Olympic Steamship, the Washington Supreme Court held that "[a]n insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance *826 contract is entitled to attorney fees."[63] To determine whether this holding applies here, we must ascertain (1) whether it applies to surety bonds as opposed to insurance policies; (2) if so, whether it applies under the facts and circumstances of this case; and (3) if so, whether the total of damages and fees can exceed the amount of the bond.
The first question is whether Olympic Steamship applies when the obligee of a bond sues to obtain its benefits. In Estate of Jordan v. Hartford Acc. & Indem.,[64] the Supreme Court applied Olympic Steamship to a fidelity bond in which a corporate surety, in exchange for a premium, guaranteed the principal's honest performance of his duties under an employment contract with the obligee. In Axess International, Ltd. v. Intercargo Insurance Co.,[65] Division One applied Olympic Steamship to a maritime surety bond in which a corporate surety, in exchange for a premium, guaranteed the principal's financial ability to perform his duties under a contract of carriage. Despite ICW's claim to the contrary, "[t]he Olympic Steamship rule extends to an action to recover on a surety bond"[66] where, as here, the bond was issued by a corporate surety in exchange for a premium.
The next question is whether Olympic Steamship applies under these facts and circumstances.[67] In general, Olympic Steamship requires an award of fees when an insurer or similar obligor unsuccessfully disputes "coverage,"[68] but not when it unsuccessfully disputes "the value of the claim presented under the policy."[69] Put another way, Olympic Steamship applies when an insurer or similar obligor contests the meaning of its contract, but not when it contests other questions, as, for example, its liability in tort or the amount of damages it should pay.[70] Given that ICW has vigorously contested the meaning of its bond throughout this case, CSI has been able to obtain the benefit of that bond, for which it paid a significant premium, only through legal action. Accordingly, Olympic Steamship applies here.
The last question is whether the combined total of damages and attorney fees can exceed the amount of the bond. In McGreevy v. Oregon Mutual Insurance Company,[71] the plaintiffs' legally recoverable damages were $455,000. Policy limits were $402,000. The trial court awarded the entire $402,000 as damages and denied reasonable attorney fees. Citing Olympic Steamship, the Supreme Court ordered reasonable attorney fees in addition to policy limits.[72] Based on McGreevy, we hold that CSI can recover attorney fees reasonably incurred, both at trial and on appeal, without regard to the amount of the bond.
We affirm on all issues except reasonable attorney fees. On that issue, we remand for the trial court to determine and award, without regard to the amount of the bond, the amount of attorney fees reasonably incurred by CSI both at trial and on appeal.
We concur: HUNT and VAN DEREN, JJ.
NOTES
[1] II Clerk's Papers (CP) at 72 (§ 6(b)(12)).
[2] Cf. 17 AM.JUR.2D Contractors' Bonds § 1 at 730 (performance bond guarantees performance).
[3] II CP at 82 (capitalization removed).
[4] II CP at 138.
[5] V CP at 663 (Findings of Fact No. 27).
[6] V CP at 662-63 (Findings of Fact No. 22).
[7] II CP at 146-47.
[8] II CP at 149.
[9] I CP at 10. Action went out of business and is not party to this appeal.
[10] Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991).
[11] V CP at 663-65; IV CP at 522.
[12] 117 Wash.2d 37, 811 P.2d 673.
[13] Br. of Appellant at 13 (emphasis removed).
[14] Br. of Appellant at 13 (emphasis removed).
[15] Joint Admin. Bd. v. Fallon, 89 Wash.2d 90, 94, 569 P.2d 1144 (1977); Walter Concrete Constr. Corp. v. Lederle Laboratories, 758 N.Y.S.2d 260, 99 N.Y.2d 603, 788 N.E.2d 609 (2003).
[16] Fallon, 89 Wash.2d at 94, 569 P.2d 1144.
[17] McCombs Constr., Inc. v. Barnes, 37 Wash.App. 91, 93, 678 P.2d 837, review denied, 102 Wash.2d 1002 (1984); McIntyre v. Fort Vancouver Plywood Co., Inc., 24 Wash.App. 120, 127, 600 P.2d 619 (1979).
[18] Wagner v. Wagner, 95 Wash.2d 94, 101, 621 P.2d 1279 (1980); Allstate Ins. Co. v. Huston, 123 Wash.App. 530, 542 n. 29, 94 P.3d 358 (2004).
[19] Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 134 Wash.2d 413, 428, 951 P.2d 250 (1998); Stouffer & Knight v. Cont'l Cas. Co., 96 Wash.App. 741, 749, 982 P.2d 105 (1999), review denied, 139 Wash.2d 1018, 994 P.2d 849 (2000).
[20] Fallon, 89 Wash.2d at 94, 569 P.2d 1144; accord, Estate of Jordan v. Hartford Acc. and Indem. Co., 120 Wash.2d 490, 497, 844 P.2d 403 (1993); Nat'l Bank v. Equity Investors, 86 Wash.2d 545, 555, 546 P.2d 440 (1976).
[21] Ross v. Harding, 64 Wash.2d 231, 236, 391 P.2d 526 (1964).
[22] Stewart v. Chevron Chem. Co., 111 Wash.2d 609, 613, 762 P.2d 1143 (1988) (emphasis removed) (quoting Restatement (Second) of Contracts § 2 (1981)).
[23] Ross, 64 Wash.2d at 236, 391 P.2d 526.
[24] LAURENCE P. SIMPSON, CONTRACTS § 144 at 300 (2d ed.1965).
[25] Cartozian & Sons, Inc. v. Ostruske-Murphy, Inc., 64 Wash.2d 1, 5-6, 390 P.2d 548 (1964); Jacks v. Blazer, 39 Wash.2d 277, 285, 235 P.2d 187 (1951); SIMPSON ON CONTRACTS 158 at 329.
[26] Pronger v. Old Natl. Bank, 20 Wash. 618, 626, 56 P. 391 (1899); Wilkinson v. Smith, 31 Wash.App. 1, 13, 639 P.2d 768, review denied, 97 Wash.2d 1023 (1982) (quoting Labor Hall Assn. v. Danielsen, 24 Wash.2d 75, 81, 163 P.2d 167 (1945)).
[27] Cartozian & Sons, 64 Wash.2d at 5-6, 390 P.2d 548 ("any breach will give rise to cause of action for damages"); Restatement (Second) of Contracts § 346 cmt. a ("Every breach of contract gives the injured party a right to damages against the party in breach, unless the contract is not enforceable against that party[.]"); see also Ross, 64 Wash.2d at 236, 391 P.2d 526; Tacoma Northpark, LLC v. NW, LLC, 123 Wash.App. 73, 79, 96 P.3d 454 (2004) (citing Ross, 64 Wash.2d at 236, 391 P.2d 526). 79, 96 P.3d 454 (2004) (citing Ross, 64 Wash.2d at 236, 391 P.2d 526).
[28] SIMPSON ON CONTRACTS § 187 at 377; see also SIMPSON ON CONTRACTS § 158 at 329.
[29] II CP at 82.
[30] II CP at 82.
[31] II CP at 82 (capitalization removed; emphasis added).
[32] See Fallon, 89 Wash.2d at 95, 569 P.2d 1144 ("Generally, a bond is effective when delivered and accepted.").
[33] We have no occasion to consider or address Paragraph D in this case.
[34] Subparagraph (1) permits ICW to step in and rectify Action's performance if CSI elects to declare Action in default. Subparagraph (2) permits CSI to arrange substitute performance after reasonable notice to ICW, or, alternatively, to demand that ICW arrange such performance. Subparagraph (3) describes measures of damage.
[35] II CP at 82.
[36] 12 CORBIN ON CONTRACTS § 1227 at 530 n. 90 (1993) ("An express provision for one remedy in case of breach is not operative as a `waiver' of other remedies that are available at law.").
[37] 17 F.3d 106 (5th Cir.1994).
[38] See, e.g., Emrich v. Connell, 41 Wash.App. 612, 626-27, 705 P.2d 288 (1985), rev'd on other grounds, 105 Wash.2d 551, 716 P.2d 863 (1986).
[39] L & A Contracting Co., 17 F.3d at 110.
[40] We disagree with L & A in other respects, for reasons discussed below.
[41] II CP at 72 (§ 6(b)(12)) (emphasis added).
[42] Even if we assume Paragraph C is ambiguous in this respect  an assumption we do not think is true  we must construe Paragraph C "in favor of liability of the surety." Fallon, 89 Wash.2d at 94, 569 P.2d 1144; Estate of Jordan, 120 Wash.2d at 497, 844 P.2d 403; Nat'l Bank, 86 Wash.2d at 555, 546 P.2d 440.
[43] II CP at 83 (capitalization removed; emphasis added).
[44] 17 F.3d 106.
[45] ICW also relies on cases that have followed L & A. See, e.g., Elm Haven Constr. Ltd. P'ship v. Neri Constr. LLC, 376 F.3d 96 (2d Cir.2004); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc., 986 F.Supp. 82 (D.Conn.1997). These cases add nothing to L & A itself, so we omit them from the text. We also note that other cases have declined to follow or distinguished L & A. E.g., Cates Constr., Inc. v. Talbot Partners, 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 980 P.2d 407, 414-15 (1999) (declining to follow L & A on a point other than the one in issue here); U.S. Fid. & Guar. Co. v. Braspetro Oil Serv. Co., 369 F.3d 34, 57 (2d Cir.2004) (distinguishing L & A); DCC Constructors, Inc. v. Randall Mech., Inc., 791 So.2d 575, 577 (Fla.Dist.Ct.App.2001) (distinguishing L & A).
[46] L & A Contracting, 17 F.3d at 108.
[47] L & A Contracting, 17 F.3d at 108.
[48] This same kind of failure caused the California Supreme Court not to follow L & A and its precursor, Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd., 593 So.2d 195 (Fla.1992), on the matter of delay damages. Cates Constr., Inc., 86 Cal.Rptr.2d 855, 980 P.2d at 414-415.
[49] L & A Contracting, 17 F.3d at 109 (emphasis added; emphasis removed).
[50] ICW asserts that the bond in L & A was "identical" to the bond here. Br. of Appellant at 17. The opinion in L & A does not show the entire bond there in issue  it fails to quote Paragraphs A and B, for example  but the parts it does show are the same. Accordingly, we assume that ICW's assertion is true. If the bond in L & A was materially different from the bond here, L & A is distinguishable and has no bearing here.
[51] Accord, Walter Concrete, 758 N.Y.S.2d 260, 788 N.E.2d at 610 (rejecting surety's assertion that it was not liable because "it had not received a declaration of default which... was a necessary precursor to its liability under the bond").
[52] As explained earlier, we agree with L & A insofar as it distinguishes between "breach" and "default."
[53] V CP at 664.
[54] Molin v. New Amsterdam Cas. Co., 118 Wash. 208, 212, 203 P. 8 (1922); Parsons v. Pac. Surety Co., 69 Wash. 595, 597, 125 P. 954 (1912); Lazelle v. Empire State Sur. Co., 58 Wash. 589, 592, 109 P. 195 (1910); Denny v. Spurr, 38 Wash. 347, 352, 80 P. 541 (1905).
[55] 44 Wash.App. 285, 723 P.2d 2 (1986).
[56] Puyallup Valley Bank, 44 Wash.App. at 287, 723 P.2d 2; see also In re Alcock, 50 F.3d 1456, 1462 (9th Cir.1995); 74 AM.JUR.2D Suretyship § 126.
[57] V CP at 665.
[58] Puyallup Valley Bank, 44 Wash.App. at 287, 723 P.2d 2.
[59] See Prier v. Refrigeration Engineering, 74 Wash.2d 25, 32, 442 P.2d 621 (1968).
[60] 117 Wash.2d 37, 811 P.2d 673.
[61] IV CP at 521.
[62] The offsite contract states:

"In the event either party institutes suit in Court ... against the other party, or against the surety of such party, in connection with any dispute or matter arising under the Subcontract, the Contractor [CSI] shall be entitled to recover reasonable attorney's fees, expert witness fees and expenses, and costs relating to such Suit."
II CP at 75 (§ 19).
[63] Olympic S.S., 117 Wash.2d at 54, 811 P.2d 673; see also McGreevy v. Or. Mut. Ins. Co., 90 Wash.App. 283, 290, 951 P.2d 798 (1998).
[64] 120 Wash.2d 490, 844 P.2d 403.
[65] 107 Wash.App. 713, 30 P.3d 1 (2001).
[66] Axess Int'l Ltd., 107 Wash.App. at 720, 30 P.3d 1.
[67] This question may be conceded, as it is not argued by either party. It is mentioned by amicus, however, so we treat it briefly. See Br. of Amicus at 14-15.
[68] Mailloux v. State Farm Mut. Auto. Ins. Co., 76 Wash.App. 507, 516, 887 P.2d 449 (1995) (citing Olympic S.S., 117 Wash.2d at 53, 811 P.2d 673).
[69] Dayton v. Farmers Ins. Group, 124 Wash.2d 277, 280, 876 P.2d 896 (1994).
[70] See Mailloux, 76 Wash.App. at 517-18, 887 P.2d 449.
[71] 128 Wash.2d 26, 904 P.2d 731.
[72] McGreevy, 128 Wash.2d 26, 904 P.2d 731.