IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| K.N.Z.; R.L.M., a minor; STEVE ZABRISKIE AND BETH ANNE LOBEY; DEAN MANNING AND SHERRY FAWVER, | ) ) ) ) ) | No. 33001-0-III |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| FRED J. BEEMAN, an individual; DEBBY DILLING AND JERRY DILLING, wife and husband and the marital community composed thereof; and CHRIS BEEMAN, an individual, | ) ) ) ) ) | |
| Respondents. | ) | |

SIDDOWAY, C.J. — The parents of K.N.Z. and R.L.M.,[1] individually and on behalf

of their minor daughters, filed this negligence action against Fred Beeman and his

siblings, Debbie Dilling and Chris Beeman.[2] It is undisputed that Fred sexually molested

K.N.Z. and R.L.M. when they were young girls. The sole issue on appeal is whether the

trial court erred in granting summary judgment in favor of Fred's siblings because it

---

[1] A pseudonym is used for the children's names, consistent with the General Court Order dealing with the use of children's names in opinions, orders, and rulings.

[2] Fred Beeman and his brother, Chris, share the same last name. To avoid confusion, this opinion refers to them by their first names. No disrespect is intended.

concluded, as a matter of law, that they owed no duty to the plaintiffs. Because the trial court correctly determined that no duty existed, we affirm.

FACTS AND PROCEDURAL BACKGROUND

Fred had been good friends with K.N.Z.'s father, Steve Zabriskie, since high school. Mr. Zabriskie met Ms. Dilling and Chris through their brother, although Fred's siblings claim they were never anything more than acquaintances of Mr. Zabriskie. Ms. Dilling does not recall ever meeting his daughter. The complaint alleges that Fred molested K.N.Z. in 2000. Clerk's Papers (CP) at 2, 251. The record indicates that Fred was residing in the Vancouver area during this time, while Chris was living with his parents in Grayland and Ms. Dilling was living in Federal Way. CP at 33, 60. Ms. Dilling claims she never stayed with her brother while she was living in Federal Way, and saw him only at family gatherings.

In 2001, Fred was charged with sexually molesting another child and ultimately pleaded guilty to communicating with a minor for immoral purposes. CP at 223. As part of his plea bargain, Fred was required to attend court-mandated counseling. The record shows that Fred stayed with Mr. Zabriskie after the charges. CP at 3, 33-34. According to Ms. Dilling, Mr. Zabriskie was Fred's "main support" during this time. CP at 34. While Mr. Zabriskie stated in a declaration that he knew Fred spent a weekend in jail in 2001, he "did not know until much later that it was because he had molested a child." CP at 79.

2

In early 2003, Ms. Dilling and her husband moved to Oregon. Unable to find work there, Ms. Dilling got a part-time job in a hospital in Vancouver and began working there eight days a month. She stayed with Fred at his apartment in Vancouver during the days she worked at the hospital. Later that year, Fred moved into his mother's house in Vancouver. But because Fred was working two jobs and Ms. Dilling worked night shifts, she claims they spent very little time together while she stayed with him in Vancouver.

R.L.M.'s father, Mr. Manning, lived down the street from the Beeman home in Vancouver. According to Mr. Manning, he became good friends with Chris, and was also "friendly" with Fred and Ms. Dilling. He claims Ms. Dilling and Chris both socialized with the plaintiffs over the years. The complaint alleges that the misconduct involving R.L.M. took place in 2004. CP at 2. In his declaration, Chris states that he moved in with Fred during the spring of 2004, and lived with his brother until early 2005. CP at 60. He claims he met Mr. Manning and Mr. Manning's daughter around this time. *Id.* But Chris asserts he rarely stayed at the Vancouver house because he met his significant other shortly after moving in with Fred.

Ms. Dilling states that she met Mr. Manning and R.L.M. at the Vancouver house in "late 2005 or early 2006." CP at 34. She claims she had very little interaction with the Mannings and that every time she saw their daughter, R.L.M. was accompanied by one of her parents.

3

In 2011, Fred was charged with two counts of first degree child molestation and one count of first degree rape of a child for his sexual contact with K.N.Z and R.L.M. CP at 248-49. He ultimately pleaded guilty to two counts of indecent liberties and one count of possession of depictions of a minor engaged in sexually explicit conduct. CP at 251. Fred was sentenced to 75 months of confinement, and is currently serving that sentence.

The plaintiffs filed this civil lawsuit in 2012. In addition to the various claims against Fred arising from his criminal conduct, the complaint alleged a negligence cause of action against Ms. Dilling and Chris. CP at 6. Specifically, the plaintiffs alleged that Ms. Dilling and Chris failed to exercise ordinary and reasonable care in (1) supervising Fred, (2) warning the plaintiffs of Fred's sexual proclivities toward minor children, and (3) preventing Fred's actions against K.N.Z. and R.L.M. *Id.*

Both siblings moved to dismiss under CR 12(b)(6), or, in the alternative, for summary judgment. CP at 56, 77. They argued that dismissal of the plaintiffs' claims against them was required on the grounds that they owed no legal duty. After hearing oral arguments from the parties, the trial court granted Ms. Dilling's and Chris's motions for summary judgment.[3] The plaintiffs appeal.

---

[3] The plaintiffs' claims against Fred remain pending. CP at 316.

ANALYSIS

The plaintiffs contend that the trial court erred in granting summary judgment in favor of Ms. Dilling and Chris based on its determination that they owed no duty to the plaintiffs. When reviewing an order for summary judgment, this court engages in the same inquiry as the trial court. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Summary judgment is properly granted when there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c).

The party moving for summary judgment "bears the initial burden of showing the absence of an issue of material fact." *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). "Once the moving party has met its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial." *Rathvon v. Columbia Pac. Airlines*, 30 Wn. App. 193, 201, 633 P.2d 122 (1981); CR 56(e). The party opposing summary judgment "may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986); CR 56(e).

To prevail in a negligence action, a plaintiff must establish "(1) the existence of a duty owed to the complaining party; (2) a breach of that duty; (3) injury; and (4) that the claimed breach was a proximate cause of the resulting injury." *Lauritzen v. Lauritzen*, 74

Wn. App. 432, 438, 874 P.2d 861 (1994). "'[A]n indispensable factor to liability founded upon negligence is the existence of a duty of care owed by the alleged wrongdoer to the person injured.'" *Kim v. Budget Rent A Car Sys., Inc.*, 143 Wn.2d 190, 194-95, 15 P.3d 1283 (2001) (quoting *Routh v. Quinn*, 20 Cal. 2d 488, 491, 127 P.2d 1 (1942)). "Absent a duty of care, a defendant is not subject to liability for negligent conduct." *Lauritzen*, 74 Wn. App. at 438.

Whether the defendant owed a duty of care is a question of law to be determined by the court. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). The existence of a legal duty "'depends on mixed considerations of logic, common sense, justice, policy, and precedent.'" *Snyder v. Med. Serv. Corp.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001) (internal quotation marks omitted) (quoting *Lords v. No. Auto. Corp.*, 75 Wn. App. 589, 596, 881 P.2d 256 (1994). "Once this initial determination of legal duty is made, the jury's function is to decide the foreseeable range of danger thus limiting the scope of that duty." *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982).

Our Supreme Court has adopted the *Restatement (Second) of Torts* § 314 (1965), which states, "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Under § 314, therefore, "[t]he legal duty to act for the protection of others

6

requires more than knowledge of a risk of harm." *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 738, 985 P.2d 262 (1999).

It is also well settled that, in general, "'a private person does not have a duty to protect others from the criminal acts of third parties.'" *Kim*, 143 Wn.2d at 195 (quoting *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 199, 943 P.2d 286 (1997)). The rationale for this rule is that "a person is normally allowed to proceed on the basis that others will obey the law." *Tortes v. King County*, 119 Wn. App. 1, 7, 84 P.3d 252 (2003); *C.J.C.*, 138 Wn.2d at 738. In other words, "criminal conduct is usually not reasonably foreseeable." *Parrilla v. King County*, 138 Wn. App. 427, 436, 157 P.3d 879 (2007).

Washington courts have recognized exceptions to this general rule in two situations. First, under *Restatement* § 315, a defendant may have a duty to guard against the criminal conduct of a third party "where a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct." *Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983). Additionally, in limited circumstances, § 302B "may create an independent duty to protect against the criminal acts of a third party where the actor's own affirmative act creates or exposes another to the recognizable high degree of risk of harm." *Robb v. City of Seattle*, 176 Wn.2d 427, 429-30, 433, 295 P.3d 212 (2013). As our Supreme Court recently explained in *Robb*, a defendant may have a duty

7

to take action for the aid or protection of the plaintiff in cases involving misfeasance (or affirmative acts) where the actor's prior conduct, whether tortious or innocent, may have created a situation of peril to the other. Liability for nonfeasance (or omissions), on the other hand, is largely confined to situations where a special relationship exists.

*Robb*, 176 Wn.2d at 436; *see also* RESTATEMENT § 302 cmt. a ("The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty").

The plaintiffs here contend that Ms. Dilling and Chris owed a duty under both theories—the existence of a special relationship and the undertaking of an affirmative act. We address these arguments in turn.

### I. No Affirmative Act

The plaintiffs first argue that Chris's and Ms. Dilling's failure to warn them about Fred's proclivities or to take reasonable steps to protect the minor girls from their brother amounts to malfeasance. While the law generally recognizes no liability where the plaintiff's injury results from the defendant's failure to act, *Restatement* § 302B provides that "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." Our Supreme Court has held that a duty to protect against the criminal acts of third parties may arise under this provision "'where the actor's own affirmative act has created or exposed the other to a recognizably high degree of risk of harm through such

8

misconduct.'" *Washburn v. City of Fed. Way*, 178 Wn.2d 732, 757-58, 310 P.3d 1275 (2013) (quoting *Robb*, 176 Wn.2d at 434).

For example, § 302B recognizes a duty in cases where "'the defendant's property affords a special (or peculiar) temptation or opportunity for crime' or if the defendant's affirmative actions bring about a special 'temptation or opportunity' for criminal conduct." *Lauritzen*, 74 Wn. App. at 443 (quoting *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 230-32, 802 P.2d 1360 (1991)). Or the defendant "may have committed himself to the performance of an undertaking, gratuitously or under contract, and so may have assumed a duty of reasonable care for the protection of the other, or even of a third person." *Robb*, 176 Wn.2d at 434-35 (quoting RESTATEMENT § 302B cmt. e). Generally, however, such a duty is "an express or an implied term of the agreement." RESTATEMENT § 302B cmt. e.

The plaintiffs contend that "[t]his is not a case of mere inaction" because Ms. Dilling and Chris undertook the responsibility of monitoring Fred to prevent the type of harm that occurred in this case. Br. of Appellants at 6. For support, they point to the following statement in Mr. Manning's declaration in which he described a conversation he allegedly had with Chris after first learning that Fred had abused his daughter:

> I then spoke again with Chris Beeman. He said that "we," which I took to mean he and his sister, had been sent by their mother to Vancouver to keep watch over Fred. Chris Beeman volunteered that they had failed in that regard, and he apologized tearfully for that failure and for what had happened to my daughter.

9

CP at 82. The siblings dispute that they were sent to Vancouver to watch over their brother, and also challenge the admissibility of Mr. Manning's statement on the grounds that it is hearsay and is based solely on speculation and conjecture. Although Ms. Dilling raised this objection below, the trial court never directly ruled on her motion to strike this portion of Mr. Manning's declaration.

"A court cannot consider inadmissible evidence when ruling on a motion for summary judgment." *Dunlap v. Wayne*, 105 Wn.2d 529, 535, 716 P.2d 842 (1986). CR 56(e) explicitly requires that affidavits supporting or opposing a motion for summary judgment (1) be made on personal knowledge, (2) set forth such facts as would be admissible in evidence, and (3) affirmatively show "that the affiant is competent to testify to the matters stated therein." *See also Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359, 753 P.2d 517 (1988).

Ms. Dilling first contends that Mr. Manning's statement is inadmissible hearsay. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). It is inadmissible unless it falls under one of the recognized exceptions to the hearsay rule. ER 802; *State v. Chapin*, 118 Wn.2d 681, 685, 826 P.2d 194 (1992). The statement Chris allegedly made to Mr. Manning was made out of court, and was offered to prove that Ms. Dilling and Chris had knowledge and control over their brother's conduct. Although the

10

statement qualifies as an admission by a party opponent under ER 801(d)(2)[4] and may therefore be used against Chris, it is inadmissible hearsay as used against Ms. Dilling.

Ms. Dilling also asserts that Mr. Manning's statement is inadmissible because he speculates that when Chris said "we," he was also referring to Ms. Dilling. Under ER 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." It is also well settled that "speculation, argumentative assertions, opinions and conclusory statements will not defeat [a summary judgment] motion." *Suarez v. Newquist*, 70 Wn. App. 827, 832, 855 P.2d 1200 (1993).

But even if the court considered Mr. Manning's statement, the plaintiffs cannot overcome summary judgment. That Ms. Dilling and Chris had been sent to watch over Fred and to prevent him from molesting young children—even if true—shows only that they had knowledge of his sexual proclivities. But as noted above, knowledge alone is insufficient to create a duty. RESTATEMENT § 314. This evidence does not establish that the siblings undertook an affirmative act which "created or exposed" the plaintiffs to the risk of harm. *Id.* § 302B cmt. e; *see also id.* § 302 cmt. a (one who does an affirmative

---

[4] ER 801(d)(2) provides that "[a] statement is not hearsay if [it is] offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

act may have a duty to protect others "against an unreasonable risk of harm to them *arising out of the act*") (emphasis added).

Absent evidence that K.N.Z.'s and R.L.M.'s parents were aware the siblings had been tasked with watching over their brother, there is no reason to presume they would have conducted themselves differently or limited their daughters' interactions with Fred. The plaintiffs' own declarations show that they had no knowledge of any such undertaking, or even that Fred posed any kind of threat to their daughters. CP at 79-83. Accordingly, this is not a situation in which the actor's affirmative act was "intended or likely to defeat a protection" the plaintiffs would otherwise have had in place, *Restatement* § 302B cmt. e, nor which induced their reliance. *See, e.g., Webstad v. Stortini*, 83 Wn. App. 857, 876, 924 P.2d 940 (1996) (defendant had no duty to prevent woman from committing suicide at his house where he "did not create or increase the risk of harm to [the deceased], or induce her reliance, or prevent her from seeking assistance from others").

Both parties cite *Pamela L. v. Farmer*, 112 Cal. App. 3d 206, 169 Cal. Rptr. 282 (1980). In that case, the California Court of Appeals held that a wife owed a duty to three minor girls who were sexually molested by her husband, whom she allegedly knew had molested children in the past. *Id.* at 207-10. But unlike here, the wife's own affirmative acts in that case increased the risk of harm. *Id.* at 210. For example, the wife invited the children to play in her swimming pool, prepared refreshments to entice them, and

12

encouraged the girls' parents to permit their daughters to come to her house by assuring them that it would be "perfectly safe" for the girls to swim at their place because her husband would be there. *Id.* The court held that, "[b]y encouraging and inviting the children to be alone with [her husband] under circumstances where he would have peculiar opportunity and temptation to commit such misconduct," a jury could find that she unreasonably exposed the children to harm. *Id.* In contrast, the plaintiffs here presented no evidence that Ms. Dilling and Chris ever encouraged or invited the girls to come to the Beeman home, nor made any assurances to their parents that they would be safe spending time alone with Fred.

The plaintiffs also argue this case involves an affirmative act because the siblings "increased the risk of harm by facilitating [Fred's] interaction with R.L.M." Br. of Appellants at 8. They assert that the siblings "socialized with plaintiffs, giving [Fred] additional opportunities to engage in criminally improper acts." *Id.* at 7. The only evidence they provide to support this assertion is Mr. Manning's statement that he was "good friend[s]" with Chris, and was also "friendly" with Ms. Dilling. CP at 81. He notes, for example, that Ms. Dilling attended his daughter's birthday party in 2009. CP at 81-82.

Even considering this evidence, however, the plaintiffs' evidence is insufficient to defeat summary judgment. It is true that a duty may arise "where defendant affirmatively brings about 'an especial temptation and opportunity for criminal misconduct.'"

*Hutchins*, 116 Wn.2d at 230 (quoting W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 33, at 201 (5th ed.1984)). But as the court in *Hutchins* explained, "[I]t is not enough to say with the benefit of hindsight that a high degree of risk of crime was created because these defendants' property in fact provided a place of concealment for muggers." *Hutchins*, 116 Wn.2d at 232; *see also Webstad*, 83 Wn. App. at 873 ("Negligence cannot be inferred from the mere fact that an injury occurred."). Likewise, a duty did not arise simply because Ms. Dilling and Chris lived at the Beeman home around the time that R.L.M. was abused and occasionally socialized with the plaintiffs.

Notably, there is no evidence that the abuse occurred while Ms. Dilling or Chris were socializing with any of the plaintiffs, and both siblings submitted declarations indicating that they spent very little time at the Vancouver house even while they were living there. Moreover, Ms. Dilling stated that every time she saw R.L.M., the girl was accompanied by one of her parents. Finally, there is no evidence that either Ms. Dilling or Chris ever witnessed any inappropriate behavior. Aside from Fred's 2001 conviction, Ms. Dilling asserts she had "no indication" based on her interactions with Fred "that he would do the things that were alleged in 2001 and 2011[, and] certainly didn't believe that after the 2001 case and court-mandated treatment that he would be charged with another sexual offense." CP at 35.

14

The plaintiffs presented no evidence that Ms. Dilling or Chris facilitated Fred's interactions with their daughters so as to provide a special or peculiar opportunity to engage in any criminal conduct. Accordingly, they have not met their burden of showing an affirmative act by the siblings which "created or exposed" them to "a recognizable high degree of risk of harm through such misconduct, which a reasonable person would have taken into account." *Parrilla*, 138 Wn. App. at 439.

## II. No Special Relationship

We next consider whether Ms. Dilling or Chris had a special relationship with either Fred or the plaintiffs which created a duty to protect the plaintiffs or control their brother's conduct. *Restatement* § 315 provides that while an actor generally has no duty "to control the conduct of a third person as to prevent him from causing physical harm to another," such a duty may arise where either

> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection

RESTATEMENT § 315. These two types of relationships are alternative grounds from which a duty can arise. *N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints*, 175 Wn. App. 517, 528, 307 P.3d 730 (2013), *review denied*, 179 Wn2d 1005 (2013).

15

With respect to the first category, *Restatement* §§ 314A and 320 address the relationships between a defendant and a victim which may give rise to a duty to control the conduct of third persons for the protection of another. Under § 314A, a duty to protect another from the intentional or criminal actions of a third party arises "where one party is 'entrusted with the well being of another.'" *N.K.*, 175 Wn. App. at 532 (quoting *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 50, 929 P.2d 420 (1997)); *Webstad*, 83 Wn. App. at 869 (noting that this "element of 'entrustment'" has been found in all cases imposing this type of protective duty) (quoting *Lauritzen*, 74 Wn. App. at 440).

No evidence was presented in this case that Ms. Dilling or Chris was ever entrusted with the care of K.N.Z. or R.L.M. Neither of the siblings were living with Fred in 2001, when the complaint alleges K.N.Z. was abused; to the contrary, the record shows that Chris was living with his parents in Grayland and that Ms. Dilling was living in Federal Way during this time. CP at 33, 60. The plaintiffs also presented no evidence contradicting Ms. Dilling's assertion that R.L.M. was never at the Vancouver house without her parents, who were presumably entrusted with her care and custody. Ms. Dilling stated in her declaration that she "never babysat, had any sort of supervision, authority, or control over R.L.M.," and that apart from "seeing [the Mannings] occasionally at the Vancouver house, there were only a couple of other times [she] remember[s] being around them." CP at 34. Even when viewed in the light most

16

favorable to the plaintiffs, the evidence does not support the existence of a special protective relationship.

The plaintiffs' primary argument on appeal seems to be that a special relationship existed between Ms. Dilling, Chris, and Fred that gave rise to a duty to control his conduct. It is true that "[e]ven when no 'special relationship' originally existed, a duty may arise when a defendant interjects himself or herself into a situation and creates a special relationship of control." *Webstad*, 83 Wn. App. at 870 (citing PROSSER AND KEETON ON THE LAW OF TORTS § 56, at 375-77 (5th ed. 1984)). The relations between a defendant and a third party which may give rise to a duty to control are set forth in *Restatement* §§ 316-319. *See* RESTATEMENT § 315 cmt. c.

Most relevant to the present case is § 319, which states that "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." But a duty will only be imposed under this section where there is a "'definite, established and continuing relationship between the defendant and the third party.'" *Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992) (quoting *Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)).

More importantly, this duty arises only where an "ability to control" is present. *C.J.C.*, 138 Wn.2d at 737; *Taggart*, 118 Wn.2d at 223-24. For example, our Supreme Court held in *C.J.C. v. Corporation of Catholic Bishop of Yakima* that churches have a

17

duty of reasonable care in selecting and supervising their workers because, "[a]s in other agency relationships, a church chooses its officials, directs their activities, and may restrict and control their conduct." 138 Wn.2d at 722. It explained that while a duty to control does not require an agency relationship, it arises "where [the] *ability to control is present*." *Id.* at 724 n.12 (emphasis added); *see also Osborn*, 157 Wn.2d 18, 24-35, 134 P.3d 197 (2006) (county had no duty to warn others of a sex offender's presence because it did not "take charge" of the sex offender, as it had no authority to control him).

Nothing in the record suggests that either Ms. Dilling or Chris had control over Fred, his actions, his activities, or the people with whom he spent his time. Aside from their claim that the siblings were sent to Vancouver to "watch over" their brother, the plaintiffs do not allege that either Ms. Dilling or Chris had the authority or actual ability to control his actions, or that they ever exercised such control. By its terms, the duty created under *Restatement* § 319 applies only to "[o]ne who *takes charge* of a third person." (emphasis added); *see also Cox v. Malcolm*, 60 Wn. App. 894, 899, 808 P.2d 758 (1991) ("[T]he duty to supervise is limited to supervision of the activity over which the third person assumed responsibility"). The plaintiffs rely solely on the fact that the siblings stayed with Fred at the Vancouver house, and that based on his 2001 conviction, they should have known of his sexual proclivities. Even when viewed most favorably to the plaintiffs, this is insufficient to establish a special relationship giving rise to a duty to prevent his unlawful conduct.

18

No. 33001-0-III
*K.N.Z. v. Beeman*

Because the plaintiffs failed to establish the existence of a legal duty, the trial court properly granted summary judgment in favor of Ms. Dilling and Chris. We affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Korsmo, J.

Fearing, J.

19